BELLE BUTLER HINGSTON, Respondent, v. EMMA
MONTGOMERY et al., Appellants.

Kansas City Court of Appeals, October 1 and November 5, 1906.

1. **CORPORATIONS: Ultra Vires: Action: Stockholders.** The
right of action arising from *ultra vires* or fraudulent acts of
the officers of a corporation belongs to the corporation and not
to the individual stockholder, but where the wrongdoers dom-
inate the action of the corporation by reason of their being a
majority of the board and stockholders, the individual stock-
holder injured by their fraudulent conduct may maintain an
action for an accounting against the corporation and such
wrongdoers.

2. ———: **Futures: Liability of Directors.** The use of the funds
of a corporation in the buying and selling of "grain futures"
renders the directors consenting thereto and their estates lia-
ble to the corporation for losses sustained thereby.

3. ———: ———: **Liability of Stockholders: Evidence.** The mere
settlement by paying the difference without the actual deliv-
ery of grain does not necessarily render the transaction a
wager but the real intention decides the character of the trans-
action and should be gathered from all facts and circumstances
and cannot be concealed by the subterfuge of a written agree-
ment; the evidence in this case established the unlawful char-
acter of the transaction and it was for the defendant to show
that their transactions were for the customers of the corpora-
tion and not for itself.

4. ———: ———: **Equity: Clean Hands.** The mere fact that
plaintiff may have indulged in dealing in futures with her own
funds does not furnish a ground for the application of the
maxim, that those coming into equity must have clean hands,
in this case where plaintiff is pursuing the directors of the
corporations for losing its funds in unlawful dealing in fu-
tures.

5. ———: **Excessive Salaries: Pleading: By-Laws.** The by-laws
of a corporation fixed a maximum for salaries. Plaintiff al-
leges that the officers "unlawfully and illegally appropriated
and converted to their own uses, large sums of money" but
did not refer to the by-law. Held, the allegation of the pe-
tition was sufficient to inform the defendant of the issue of
excessive salaries and there was no need to plead the by-law.

6. ———: **Directors' Discretion: Illegal Acts: Burden of Proof.**
The directors of a corporation have much latitude in dictating

and pursuing a policy for the corporation and so long as they act in good faith and *intra vires*, courts abstain from supervision and the burden is on the stockholder to show the injury to the corporation by the illegal turpitude of its managers.

7. ———: Res Adjudicata: **Different Causes of Action.** The plea of *res adjudicata* applies not only to all points which the court is required to pass upon, but to every point which properly belongs to the subject of litigation and might by reasonable diligence have been brought under the judgment of the court, but the judgment enjoys no such prerogative if the second action is for a different cause of action than that contested in the first one; and an action to be recognized as a stockholder in a corporation is wholly different from an action by such stockholder after recognition to compel an accounting between directors and corporation.

Appeal from Jackson Circuit court. — *Hon. W. B. Teasdale,* Judge.

REVERSED AND REMANDED (*with directions*).

*Lathrop, Morrow, Fox & Moore* for Samuel W. Sawyer, Administrator *de bonis non.*

(1) The contention of attorneys for respondent based upon the allegations in reference to speculative deals by the Montgomery Grain Company is so clearly without foundation in the evidence in the case to sustain it that it seems to us this could not have been the ground for setting aside the judgment of the court and granting a new trial. There was at best, under the evidence in regard to these dealings, merely a suspicion of wrongdoing on the part of the Montgomerys, and nothing can be added to the statement of the trial court that "suspicion will not support a finding." (2) Furthermore, as all of the pleadings in the first suit brought by plaintiff are in the record before the court, it clearly appears that the same issues raised in this case were adjudicated in that. It results that plaintiff is concluded by the judgment in that case, involving the question of salaries, option deals, and good or bad faith in the man-

agement of the company's affairs, as to all transactions prior to the time of trial in 1899. Donnell v. Wright, 147 Mo. 639; Bank v. Tracey, 141 Mo. 252; Hamilton v. McLean, 139 Mo. 678; Barkhoefer v. Barkhoefer, 93 Mo. App. 373; Hill v. Chowing, 93 Mo. App. 620; Viertel v. Viertel, 99 Mo. App. 717; Jones v. Silver, 97 Mo. App. 231. (3) There is no doubt that our courts have held that if an officer's own vote is necessary to give life to his original contract of employment, this will prevent the contract from being upheld against the corporation, but such holding has always been in cases where the rights of the minority of the stockholders were injured by such officer's vote. This rule, however, cannot be justly applied to a corporation where, as here, there were only three stockholders and directors, and where respondent, the minority, neglected and refused to make any effort to exercise her rights. If this doctrine were to be applied to this corporation, as respondent will claim, the corporation would have been unable to do a single act where the personal interest of either of the Montgomerys were involved. They could not have loaned it money, or have given it the benefit of their individual memberships in the board of trade. This would have immediately brought the company's business to a standstill, and above the right of any minority is the right of the corporation to continue its business and accomplish the objects for which it was formed. (4) Another unwarranted claim of the attorneys for respondent is their claim that as the secretary of the company was to keep the records and attend to the correspondence, no bookkeepers or stenographers could be employed by the company, no matter what its volume of business might be, but that the secretary was bound to do all this himself for the salary paid him as secretary. This is reasoning approaching the ridiculous, and is directly contrary to many decisions of our courts. Beach v. Stouffer, 84 Mo. App. 395; Coal Co. v. Watson, 107 Mo. App. 451.

*Ellis, Cook & Ellis* for appellants.

(1)   All the issues which might have been raised and litigated in any case are as completely barred by the final decree therein as · if they had been directly adjudicated and included in the verdict.   Donnell v. Wright, 147 Mo. 639; Stone Co. v. Wall, 108 Mo. App. 495; Bank v. Tracey, 141 Mo. 252; Hamilton v. McLean, 139 Mo. 678; Barkhoefer v. Barkhoefer, 93 Mo. App. 373; Hill v. Chowning, 93 Mo. App. 620; Viertel v. Viertel, 99 Mo. App. 717; Jones v. Silver, 97 Mo. App. 231; Herman Estop., sec. 5, pp. 43, 44; Herman Estop., sec. 100, p. 101; Hamilton v. McLean, 169 Mo. 51; Railroad v. Levy, 17 Mo. App. 501; 21 Am. and Eng. Ency. Law (1 Ed.), 265; 24 Am. and Eng. Ency. Law (2 Ed.), 781.

*J. C. Rosenberger* and *J. L. Lorie* for respondents.

(1)   The issue of accounting not being determined by reason of the decree turning on plaintiff's rights as a stockholder, there is no estoppel in this case as to the accounting.   24 Am. and Eng. Ency. Law (2 Ed.), 776, and note 1; Lumber Co. v. Nickey, 89 Mo. App. 270; Warden v. Busbee, 89 Mo. App. 116; Clemens v. Murphy, 40 Mo. 121; Wright v. Salisbury, 46 Mo. 26; Spradling v. Conway, 51 Mo. 51.  ` (2)   The salaries drawn were unlawful and excessive.   Cook on Stock and Stockholders (2 Ed.), sec. 700a; Carroll v. Bank, 8 Mo. App. 253; Trust & Savings Co. v. Lumber Co., 118 Mo. 457; Ward v. Davidson, 89 Mo. 445; Mill Co. v. Bennett, 39 Mo. App. 460; 21 Am. and Eng. Ency. Law (2 Ed.), 877, 910; Bennett v. Roofing Co., 19 Mo. App. 349; Patrick v. Gas Light Co., 17 Mo. App. 462; Butts v. Wood, 37 N. Y. 317; Adams v. Burke, 102 Ill. App. 148; Pfeiffer v. Brake Co., 44 Mo. App. 59; R. S. 1899, sec. 973; Adlets v. Shoe Co., 84 Mo. App. 288; Hughes v. Cash Register Co., 112 Mo. App. 91; 2 Cook on Corporations (4 Ed.), secs. 731, 732, 733 and notes; Ellis v. Ward,

137 Ill. 509. (3) The defendants are liable on account of the breach of trust of the Montgomerys as directors in bucketshop gambling with the corporate funds. Scott v. Brown, 54 Mo. App. 607; Crawford v. Spencer, 92 Mo. 498; Robinson v. Smith, 3 Paige Ch. 222; Trust Co. v. Weed, 2 Fed. Rep. 24; Harding v. Newton, 14 Blatch. 376; Smith v. Rathbun, 22 Hun 150; London Credit Co. v. Lord, 17 W. R. 562; Cook on Stockholders, sec. 682, note and sec. 816. (4) The defendants are liable on account of the failure of P. H. and W. N. Montgomery to pay for their stock in the company.

JOHNSON, J.—This is an action in equity brought on behalf of a business corporation by one of its stockholders against its managing officers for an accounting and for the recovery of funds belonging to the corporation alleged to have been unlawfully diverted. A trial of the cause resulted in a decree in favor of defendants but the court sustained the motion for a new trial filed by plaintiff on the ground "that the finding and judgment was for the wrong party" and defendants appealed.

On or about July 1, 1897, plaintiff (then Miss Belle Butler) bought 33 1-3 shares of the capital stock of the Montgomery Grain Company of the par value of $100 per share and paid par therefor. This company had been incorporated in 1892 as a business corporation. Its capital stock was $10,000 divided into one hundred shares and the purpose for which it was created was to engage in the grain business in Kansas City as a commission dealer. When plaintiff purchased the stock mentioned the company was in the enjoyment of a large and profitable commission business and its assets exceeded liabilities by more than $10,000 the amount of its capital stock. Its managing officers were P. H. Montgomery, president, W. N. Montgomery, secretary, and H. S. Downs, vice-president. All of the stock, except

one or two shares, was owned by the two Montgomerys. Plaintiff was a stenographer employed by a competing dealer. She had some money to invest and was induced by the representations of Downs to purchase the stock. To avoid injury to her position with her employers, she gave the money to Downs who paid for the stock and had a certificate issued in the name of H. D. Smithson — his father-in-law — who on the same day indorsed and delivered it to plaintiff. Soon thereafter the Montgomerys expelled Downs from the corporation on the ground of misconduct and claimed he owned the company about $1,500.

After this plaintiff who was at the time indebted to the company on a note of about $100 presented the certificate; offered to pay the amount of her debt and requested the Montgomerys to issue a new certificate to her in her own name. This request was refused, except on condition that plaintiff discharge the debt Downs was owing to the company. Thereupon plaintiff about July 1, 1898, brought a suit in equity against the corporation and its officers, the principal object of which was to establish her status as a stockholder and to obtain proper recognition as such by the officers of the company without first being compelled to pay the Downs indebtedness. Plaintiff in that case was unsuccessful in the circuit court, but on appeal we held she was entitled to a transfer of the stock on the books of the company and that no lien existed thereon for the Downs indebtedness and reversed and remanded the judgment. [Butler v. Montgomery Grain Co., 85 Mo. App. 50.] Judgment afterwards was entered in favor of plaintiff in accordance with the mandate and to comply therewith the defendants on August 10, 1900, caused a new certificate for the stock to be issued and delivered to plaintiff.

On September 5, 1900, the stockholders of the company held a meeting for the purpose of electing a director to fill a vacancy on the board. The two Mont-

gomerys were directors and owned all of the stock, except that owned by plaintiff and one other share. The board of directors consisted of three members. Plaintiff was present at the meeting with her attorney and protested that the meeting was illegal but notwithstanding her protest she was elected to fill the vacancy. She refrained from exercising the functions of that office, but demanded and obtained permission to examine the books and records of the company and employed an accountant who made the examination for her. She then brought this present action on February 19, 1901, in which the corporation and the two Montgomerys are joined as defendants. After the suit was brought W. N. Montgomery died and sometime thereafter P. H. Montgomery died. The cause stands revived in the names of the executrix of the estate of P. H. Montgomery and of the administrator *de bonis non* of the estate of W. N. Montgomery.

The relief sought is predicated on various wrongful acts alleged to have been perpetrated by the Montgomery brothers in the management of the business and plaintiff as a reason for bringing the suit in her own name alleges that as they "are a majority of the board of directors of said grain company and hold a majority of the stock of said grain company it would be a useless and idle ceremony to request said directors to institute this action in the name of said grain company and that plaintiff is therefore compelled to bring this suit in her own name in behalf of said corporation and to make said grain company a defendant herein." The facts in proof sustaining this averment are undisputed. When the suit was brought the Montgomery brothers owned two-thirds of the capital stock of the corporation; they were two of the three directors, one was president and the other secretary and as they are charged with having injured the artificial creature — the corporation — by misusing its funds obviously the corporation as such was powerless to act for its own protection.

It is true that a cause of action arising from the *ultra vires* or fraudulent acts of the officers of a corporation in the management of its business belongs to the corporation as a legal entity and not to the individual stockholders and the general rule is that the corporation is the only party that may maintain an action for the redress of such grievances and this rule is enforced strictly, except in cases where it appears to be impossible for the corporation to act. Ordinarily a dissatisfied stockholder should apply to the board of directors for a correction of abuses in the management and will not be heard in an action brought by him to remedy them without first he shows he has made a thorough but unsuccessful effort to set in motion the machinery of the corporation. But where it is shown that the wrongdoers constitute a majority of the board of directors and own a majority of the stock an innocent stockholder may maintain an action against the corporation and the offending officers in his own name though in reality on behalf of the corporation and through it of all of its stockholders. In other words for the purposes of that proceeding he becomes the representative of the corporation in place of its legally constituted trustees because of their infidelity and their ability to perpetuate their control. To compel a stockholder in such situation before bringing an action to request the directors to bring it in the name of the corporation would be nonsensical for it would be unreasonable to expect the directors to institute a proceeding against themselves and should they do such a thing, the bad faith of their action would be so apparent that no court would entertain the suit. [Hannerty v. Theater Co., 109 Mo. 297; Slattery v. Transportation Co., 91 Mo. 217; Loomis v. Railway Co., 165 Mo. 469; Albers v. Merchants Exchange, 45 Mo. App. 206.] Under the showing made plaintiff may maintain the action in her own name.

Shortly after this action was begun the court at

the instance of plaintiff appointed a receiver of the assets of the defendant corporation. He found property of the value of about $200 and took possession of it. It is conceded the corporation has no other assets and so it appears that during the period from the purchase by plaintiff of her stock to the bringing of this action net assets that exceeded the amount of the capital stock practically were wiped out of existence. Defendants contend this loss resulted solely from the wide publicity given by the newspapers to the litigation waged against them by plaintiff and that the serious nature of the charges made against them impaired the confidence of their customers and caused a great and constantly increasing loss of business which in time consumed the resources of the company. On the other hand plaintiff attributes the loss to acts of misconduct on the part of the Montgomerys in the particulars now to be discussed: First, it is charged that funds of the corporation were used and lost in speculation. The facts appearing in evidence to sustain that charge are as follows:

In October, 1897, a few months after plaintiff bought her stock a corporation called the Traders Grain Company was created and at once succeeded to the business of a concern called the Thayer Commission Company. Nominally the business of these organizations was that of commission dealers in grain but in reality the business conducted by them in Kansas City was what is commonly termed a "bucket shop." P. H. Montgomery was an incorporator of the Traders Grain Company; owned one-fourth of its stock and gave its business much time and attention. From about the first of 1897 to 1900 the Montgomery Grain Company was a steady customer first of the Thayer Commission Company and then of its successor, the Traders Grain Company. Many thousand of bushels of grain were bought and sold in the numerous' transactions had but in no

instance was any grain actually delivered or handled. The contracts made called for delivery at a specified future date but in every case the sale was made on the payment of a "margin" and settlements were made between the parties on some fluctuation of the market and invariably long before the dates of delivery provided in the contracts. In short every transaction was in fact a wager on the rise and fall of daily market values. The test to be applied in determining whether sales of commodities for future delivery are legitimate business transactions or are fictitiously made for the purposes of gambling is to ascertain the real intention of the parties with respect to the actual delivery of the commodity. A person has the right to sell for future delivery a thing he does not own provided he and his vendee intend at the time that an actual delivery is to be made and parties to such contracts have the undoubted right afterwards to release each other from performance either with or without the payment of a consideration by one of them. Such incidents are not uncommon in legitimate business. But the mere making of a written contract under which a delivery or its legal equivalent may be compelled is by no means conclusive of a mutual intention to deliver. The real intention is to be gleaned from all the facts and circumstances and when it appears that the written agreement is a subterfuge intended to conceal the actual agreement it will be disregarded. [Lane v. Logan Grain Co., 105 Mo. App. 215.]

The whole account between the Montgomery Grain Company and the Traders Grain Company and its predecessor is made up of gambling deals and the aggregate losses sustained by the Montgomery Company over its profits was $1,293.39. Similar losses resulting from dealings with another concern of the same character totaled $847.20 making the entire loss from gambling transactions $2,140.59. That the use of the funds of the corporation by the two Montgomerys for speculations of

this character was *ultra vires* goes without saying and that their estates should be made to account to the corporation for the funds so diverted likewise is incontrovertible. Defendants, however, deny that any of the corporation's money was lost in these transactions. They were able to show that nine of them on which the losses aggregated $265 though conducted in the name of the Montgomery Company were actually made on behalf of one of its customers and the corporation was reimbursed the loss. This was followed by testimony to the effect that it was a quite common practice for commission agents thus to serve their regular customers who desired to speculate. We are asked to assume from these facts that all transactions of this character carried in the name of the corporation were customers business on which the corporation suffered no loss. Plaintiff discharged her burden when she established the fact that the corporation had been speculating in its own name and had lost. It then devolved on defendants to account for all the losses so incurred. With the exception of the items noted they have failed to overcome the presumption we must indulge from the conceded fact that the corporation lost money in gambling operations. The corporation in its books kept a record of its transactions with its customers and by this means defendants were enabled to show that the nine items mentioned represented losses borne by one of them. Had the other losses been of the same character defendants by the same means could have shown that fact and their failure to produce such proof is quite persuasive evidence of the non-existence of the fact. The state of the proof before us necessitates the conclusion that the actual loss to the Montgomery Company from this source was the difference between the sum of $2,140.59 the total amount of loss shown by the books and $265, the amount of such loss collected from the customer leaving a net loss of $1,875.59.

Another argument advanced by defendants against the allowance of this item against them is that plaintiff herself does not come into equity with clean hands. It appears that plaintiff speculated a little on her own account and in the end lost. But she used her own money while the Montgomerys used trust funds. However immoral it may be to speculate in margins even with one's own money plaintiff committed no breach of trust. She paid the price of her folly and was the only loser by it. Her conduct in this respect is as foreign to the issues of this case as it would be had she lost money in betting in a card game or on horse races. The maxim that he who seeks equity must do so with clean hands applies only to conduct related to the subject of litigation.

Plaintiff complains of excessive and illegal salaries paid the Montgomerys for their services as officers of the company. When plaintiff purchased her stock P. H. Montgomery was drawing a salary of $125 per month and W. N. Montgomery $100 per month. Both were giving their entire time to the management of the business. A by-law limited the amount of salary that could be paid to an officer to $125 per month. On the first of December, 1897, the two Montgomerys held a meeting of the board of directors at which they were the only ones present and passed a resolution raising the salary of P. H. Montgomery to $175 per month and of W. N. Montgomery to $150 per month. Conceding that the directors meeting was legally called and held its act in attempting to increase the salaries of officers beyond the limit prescribed in the by-laws was *ultra vires* and void to the extent of such increase. The directors did not attempt to repeal or amend the by-laws and if they had their act would have been unavailing since no such authority was conferred on them either in the charter or by-laws and without it the sole power to amend the by-laws was vested in the stockholders. Acting under this resolution P. H. Montgomery was paid $50 per

month illegally for a period of twenty-one months amounting to $1,050 and W. N. Montgomery $25 per month for twenty-six months aggregating $650, making a total of $1,700 illegally paid these officers in the guise of salaries.

Defendants argue that no recovery should be permitted on this item because the by-law was not pleaded in the petition. It is alleged that these officers "unlawfully and illegally appropriated to and converted to their own use as salaries large sums of money belonging to said grain company," etc. Defendants were advised that they would be called on to meet the issue of excessive and illegal salaries and the averment is sufficient to raise that issue without the pleading of the by-law.

The two items considered, i. e., the losses from speculation and from the payment of illegal salaries do not account for the loss of the entire assets of the corporation but on the showing made by plaintiff they are the only ones for which a recovery should be enforced against the estates of the Montgomerys in favor of the corporation. In the management of these artificial bodies much latitude must be accorded to the owners of the majority interest. They have the right to dictate and pursue in their own way the policy of the corporation and so long as they act in good faith and their acts are *intra vires* courts abstain from exercising supervision over them. In an action such as this brought by a minority stockholder the *onus* is on the plaintiff to show that the corporation has been injured by the legal turpitude of its managers. Proving that injurious results have followed a merely injudicious management will not suffice to create a liability. Tested by these principles the evidence discloses no other acts of misconduct.

The other losses suffered by the corporation appear to have resulted from a combination of several causes chief among which was the publicity given the litigation waged by plaintiff. We are not intimating that plain-

tiff should be criticized for asserting her rights but a necessary and unfortunate result of her suits was the discrediting of the corporation in the eyes of the business world. Doubtless the Montgomerys exhibited poor judgment in struggling against the tide that set in against the business instead of winding it up, but that was a question of business policy which they as the majority of the board of directors and the principal stockholders had the right to settle. Regarding the complaint that they neglected the business and employed help at the expense of the corporation to perform services that should have been rendered by them as officers the evidence does not support either charge. The officers appear to have given the business all the attention its needs required and as to the employment of assistance the absence from the evidence of any suggestion of bad faith in this respect precludes us from considering that as an issue in the case. The officers had the right to employ such servants as they deemed the necessities of the business demanded and to employ their own time in the manner they thought would best promote the welfare of the corporation.

It is urged by defendants that the judgment in the former suit is an adjudication of the matters involved in the present controversy. It is true plaintiff in the petition in that case alleged misconduct in the management of the business and asked that the Montgomerys be compelled to make an accounting to the corporation and to restore to its treasury the losses incurred through their mal-administration, but the only issues litigated in that case were those relating to plaintiff's status as a stockholder. Plaintiff was asking that the stock she owned be transferred to her on the books of the company while in the cross petition the defendant corporation sought to foreclose an alleged lien on the stock for the Downs indebtedness. It apparently was conceded that until plaintiff could establish in that action her

right to recognition as a stockholder she had no standing as such to maintain an action on behalf of the corporation.

At no stage of the proceeding was any issue before us in the present suit treated as an issue in that case. Defendants concede these matters were ignored and treated as abandoned in that suit but invoke the rule as stated in Donnell v. Wright, 147 Mo. l. c. 647, that "The plea of *res adjudicata* applies except in special cases not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation and which the parties exercising reasonable diligence might have brought forward at the time." The intolerance expressed by the authorities of the practice of splitting a single cause of action and making each part the subject of a separate suit is based on the maxim of the common law that no one ought to be twice vexed for the same cause and is in the interest of peace and good order. In the application of the principle courts treat all issues that properly relate to the cause of action litigated as concluded by the judgment though some of such issues in fact may not have been referred to either in the pleadings or evidence. But as the St. Louis Court of Appeals observed in the case of Barkhoefer v. Barkhoefer, 93 Mo. App. 381, "the judgment in the first case enjoys no such prerogative if the second action is for a *different* cause of action from that contested in the first one."

In the present case the cause of action asserted is entirely different from that contested in the former suit. There the action belonged to plaintiff in her own right and its object was to place her in a position where she could exercise the rights of a stockholder. Here she is acting as the representative of the corporation and all of its members and is seeking to enforce a right belonging to the corporation. It is apparent that not only

121 App—30

are we confronted by two distinct causes of action but with the fact that they do not relate to the same subject-matter. The former judgment is no bar to the maintenance of the present action.

It follows from what we have said that the estates of the two Montgomerys should be held liable for the sums lost in speculation and wrongfully disbursed in the payment of excessive salaries. Interest should be allowed on each item from the date of conversion.

As this is a suit in equity and the issues have been thoroughly contested, no necessary nor useful purpose would be served in compelling the parties to retry the cause. The judgment is reversed and the cause remanded with directions to enter judgment in accordance with the views expressed. All concur.