BENJAMIN SAUNDERS, Appellant, v. GEORGE BAKER, Respondent.

Kansas City Court of Appeals, January 14, 1907.

1. **CONTRACTS: Wager: Pari Delicto: Duty of Court.** The legal turpitude of both parties to a gambling deal is equal and the courts will not be made the arbiters of the gambling table.

2. ——: ——: **Burden of Proof.** The burden of proof rests upon the defendant to show that the debt was the result of a wager contract.

3. ——: ——: **Written Agreement.** A written agreement set out in the opinion standing alone constitutes evidence of a high order in support of its recitals; but the test to be applied in determining the character of certain contracts for the sale of grain and stocks is the mutual intention of the parties which is to be gleaned from the facts and circumstances; and if the written agreement is a subterfuge to conceal the actual agreement it will be disregarded.

4. ——: ——: ——: **Evidence.** On a review of the evidence it is held that no reasonable mind can indulge in the inference that the parties to a certain agreement intended to do any thing else than wager on the rise and fall of the market, and since the written contract appears to be merely a sham designed to disguise the real nature of an illegal transaction it should be brushed aside as devoid of evidentiary substance.

5. ——: ——: **Loan to Pay: Court's Duty.** While a party not connected with the transaction may loan a gambler money to pay his gambling debt and collect the same though he knew of the borrower's intended use, yet where a loan is a mere devise of the winner to recover his gambling debt the courts will pierce through the attempted disguise no matter how cleverly designed and refuse to give effect to such disguise: and on the evidence in this case it is held the plaintiff's loan is of the latter character.

Saunders v. Baker.

Appeal from Buchanan Circuit Court.—*Hon. Henry M. Ramey,* Judge.

AFFIRMED.

*James W. Boyd* for appellant.

(1) If appellant lost at the gambler's table, and then borrowed money to pay his loss, the lender could recover the money loaned. Serles v. Lum, 89 Mo. App. 255; Roselle v. Beckmeier, 134 Mo. 380; Allgear v. Walsh, 24 Mo. App. 134; Hatch v. Hanson, 46 Mo. App. 323; White v. Wilson, 37 S. W. 677. (2) The contract which the defendant pleads was executed. Courts with great unanimity have held that they will protect the result. Hatch v. Hanson, 46 Mo. App. 335; Roselle v. Beckmeier, 134 Mo. 391.

*Culver & Phillip* and *James Hull* for respondent.

(1) If the transactions out of which the claim of indebtedness grew were gambling or wagering contracts and therefore illegal and void under the Kansas statute, and if the plaintiff was a party to these transactions and pecuniarily interested therein, then he cannot recover the money he paid to the Traders Grain Co. Connor v. Black, 119 Mo. 126; Crawford v. Spencer, 92 Mo. 498; McLean v. Stuve, 15 Mo. App. 317; Buckingham v. Fitch, 18 Mo. App. 91.

JOHNSON, J.—Plaintiff alleges that he paid a debt of defendant's at the latter's request and brings this action to recover $2,605.76, the amount of the advance remaining unpaid. The defense in substance is that the only transactions of a pecuniary nature between the parties were gambling deals which occurred at Leavenworth, Kansas, where plaintiff conducted a gambling place commonly called a "bucket shop" in violation of the laws

of Kansas and that defendant in fact paid all of his losses resulting from these transactions, but, whether he did or not, any such obligation is void. A trial resulted in a verdict and judgment for defendant and plaintiff appealed.

The evidence introduced by plaintiff tends to show the following state of facts: Plaintiff and a Mr. Shane, as partners, were the agents in Leavenworth of the Traders' Grain Company, a concern doing business in Kansas City. They maintained an office, in which they had installed and in operation telegraph and telephone instruments and a blackboard whereon they kept posted daily market reports for the information of customers. They bought and sold on commission grain, provisions, stocks and bonds of railroad and other corporations, and other commodities, the market values of which were subject to daily fluctuations. They made contracts with their patrons for the purchase or sale of such commodities for future delivery and in all cases required the customer to deposit a "margin." These contracts were in writing and contained the following provision:

"NOTICE.—All contracts made with us for the purchase or sale of grain, provisions or stocks made with us or through us are subject to the rules and regulations of the Board of Trade or Stock Exchange in the city where delivery is to be made, and we hereby agree to receive all property sold to us or through us, and to deliver all property bought from us or through us at maturity of contract and we will not accept any business under any other conditions, and the trades above recorded are made with this understanding. We also reserve the right to close any trade made with us, or through us without notice, if the money in our hands is, in our judgment, insufficient to protect the trade."

The business at Leavenworth was conducted in the name of the "Saunders and Shane Commission Company," but plaintiff testified that all of their customers,

including defendant, were informed that plaintiff and his partner were acting as the agents of the Traders' Grain Company, and that all transactions were immediately transmitted to their principal. Vast quantities of wheat, corn, provisions, railroad and other stocks were bought and sold in the course of business, all on contracts for future delivery, but neither buyer nor seller owned any of the property which was the nominal subject of these deals nor did plaintiff's firm or their principal possess any facilities for handling or storing grain, provisions or similar commodities. All of the deals made by plaintiff's firm were closed out and settled before the dates fixed in the contracts for the delivery of the property and in no instance was a delivery made. On the subject of the intention which the parties had at the time of making the contracts respecting the actual delivery of the property, plaintiff in his testimony is quite evasive and appears to rely on the terms of the written contracts as conclusive evidence of a mutual intention that the vendor should deliver the property sold, but when pressed to state the real intention, in effect, would go no farther than to say that in the intention of the parties the vendee could exact a delivery if he chose to insist on it. When asked to say what he called the business, they were conducting, plaintiff replied, "We called it a commission and brokerage business, some people termed it a bucket shop." Defendant, a farmer living near Weston in this State, in partnership with a Mr. Kelly of Weston traded with plaintiff's firm during the year 1900 and the early part of 1901. They made numerous deals, buying or selling in large quantities wheat, corn and railroad stocks. In all cases, the purchase was for future delivery, a small "margin" was paid by defendant to cover possible early fluctuations in the reported market values of the property which might be against defendant, and, whenever the margin was exhausted, plaintiff and his associate were required to

"margin" the deal further or it was summarily closed out. When the market went his way, plaintiff had the option of closing the transaction and being paid his winnings, or of letting it stand in the expectation that future changes in the market would increase his profit. In the end, defendant and his partner lost and on April 4, 1901, had become indebted to the Traders' Grain Company on account of the deals carried in a sum exceeding $2,700. Plaintiff demanded payment of defendant, telling him that his principal was insisting on an immediate settlement. Defendant acknowledged his indebtedness, promised to pay it and requested plaintiff to pay the Traders' Grain Company the amount due, and agreed that he would repay plaintiff. The payment was made by plaintiff pursuant to this request, but defendant failed and later refused to reimburse plaintiff and this suit followed. The foregoing are the material facts collected from the evidence of plaintiff.

On the part of defendant, it is denied that plaintiff's firm was the agent of the Traders' Grain Co., or that any representations to that effect were communicated to defendant or his partner, and it is claimed that the deals between the parties were purely speculative, without any intention on either side to deliver the property sold; that on April 1, 1901, a full settlement was made by the parties, plaintiff was paid the amount ascertained to be due from defendant and his partner and was notified that all transactions between them were closed; that the deals between that date and April 4th, on which the losses claimed by plaintiff occurred, were not authorized by defendant or his partner; and that defendant did not recognize them as an obligation, nor request plaintiff to pay their sum to the Traders' Grain Company.

The errors claimed relate entirely to the rulings of the learned trial judge in the giving and refusing of instructions, but in the view we take of the case, these

claims of error need not be discussed. The court would have been justified in peremptorily directing a verdict for defendant and, as there were no issues of fact to go to the jury, plaintiff could not have been injured by the instructions, and, therefore, no prejudicial error was committed against him.

In reaching the conclusion that plaintiff has failed to make out a case, the first step requires the finding as a matter of law, that the alleged indebtedness of defendant to the Traders' Grain Company is fictitious and void because it arose out of gambling transactions. The legal turpitude of both parties to a gambling deal is equal. Winner and loser stand on the same plane, are *in pari delicto,* and it is not out of any consideration for either party that the law interferes between them in any case. Courts will not permit themselves to be made arbiters of the gaming table or lend aid to the enforcement or correction of its results. The solicitude of the law is for the public welfare, which is menaced by the pernicious effects of gambling, and the principles applied by the courts have for their object the destruction of the practice and not the relief of the participants therein from consequences of their own wrong. Therefore, courts refuse to enforce gambling debts, not out of any care for the loser, but because by so doing they put an obstacle in the way of indulgence in the vice and thus protect the public morals. [Hatch v. Hanson, 46 Mo. App. 323.]

Though the burden of proof is on the defendant to show that plaintiff's demand is in fact a gambling debt and though as a general rule the question of the character of the transactions, from which the debt resulted, is one of fact for the jury to determine, yet, where the evidence of the party seeking to enforce the debt presents a state of facts that will admit of no other reasonable conclusion than that the debt is the offspring of gambling, it is immaterial where the burden of proof lies.

In such case, the fact, in effect, stands admitted and should. not be regarded as at issue.

This brings us to this inquiry: Are the facts adduced by defendant, which, if true, conclusively show that the demand plaintiff claims to have paid was a gambling debt, corroborated in every essential particular by plaintiff's evidence? If they are, then we will assume the ultimate facts as proven, but, should we find that defendant, who holds the burden of proof on this issue, is unsupported as to all material facts by the evidence of his adversary, we will concede the entire issue should have been sent to the jury as one of fact.

The excerpt from the written contracts of sale above quoted expresses in unmistakable terms the mutual intention of the contracting parties to deliver the property sold at the time and place specified. Standing alone, these contracts constitute evidence of a high order in support of the truth of their recitals and, if unopposed by aught but the evidence of defendant, indisputably would suffice to carry the issue to the jury. · But, in our opinion, their probative value is completely destroyed by the admissions made by plaintiff in his testimony. They were a mere subterfuge designed and intended to evade the law and do not express the real understanding and agreement of the parties. As we said in the recent case of Flingston v. Montgomery, 121 Mo. App. 451, 97 S. W. 204, "The test to be applied in determining whether sales of commodities for future delivery are legitimate business transactions or are fictitiously made for the purposes of gambling is to ascertain the real intention of the parties with respect to the actual delivery of the commodity. A person has the right to sell for future delivery a thing he does not own, provided he and his vendee intend at the time that an actual delivery is to be made, and parties to such contracts have the undoubted right afterwards to release each other from performance either with or

without the payment of a consideration by one of them. Such incidents are not uncommon in legitimate business. But the mere making of a written contract under which a delivery or its legal equivalent may be compelled is by no means conclusive of a mutual intention to deliver. The real intention is to be gleaned from all the facts and circumstances, and, when it appears that the written agreement is a subterfuge intended to conceal the actual agreement, it will be disregarded. [Lane v. Logan Grain Co., 105 Mo. App. 215, 79 S. W. 722.]" [R. S. 1899, secs. 2337, 2342.]

Neither plaintiff's firm nor their principal possessed the means or facilities for obtaining and handling the enormous quantities of property they pretended to buy and sell in the numerous deals made by them and defendant likewise was unequipped to pay for, receive, or deliver the property which he bought and sold. Each party knew of the inability of the other to perform his contracts, should delivery be demanded, and each knew to a certainty that the other would not demand a delivery. Add to these facts the course of dealing pursued by plaintiff, by which the customers of his firm, including defendant, were required to margin every deal and the contracts were invariably settled on the basis of changes in the market values of the property long before the dates fixed for delivery, and we have a state of facts from which no reasonable mind can indulge in the inference that the parties intended, when they entered into the contracts, to do anything else but wager on the rise and fall of the market. Any other supposition cannot be squared with the admitted facts and circumstances and, if entertained, would do violence to reason. The written contracts, indubitably appearing to be a mere sham designed to disguise the real nature of illegal transactions, should be brushed aside as being entirely devoid of evidentiary substance.

We find, as a matter of law, that the transactions

out of which the alleged indebtedness arose are tainted with gambling and pass to the consideration of plaintiff's contention, that, though this may be true, his cause of action does not necessarily fail.

The argument advanced is based on plaintiff's claim that the gambling debt was owned by the Traders' Grain Company, was recognized by defendant as an obligation, and that plaintiff by a subsequent and entirely independent contract loaned defendant the money with which the latter's debt was discharged. Therefore, it is said that the cause of action is not founded on the gambling transactions, but on defendant's agreement to repay borrowed money, and falls within the principle "that a party seeking a recovery cannot be defeated on account of the illegality of his prior conduct when he can make out his case otherwise than through the medium of an illegal transaction." [Roselle v. Beckemeir, 134 Mo. 380; Armstrong v. Bank, 133 U. S. 433.] With respect to loans made for the purpose of enabling the borrower to pay a gambling debt already incurred by him, the lender, if a stranger to the gambling transaction out of which the debt arose, is entitled to a repayment of the loan though he knew at the time he made it the purpose for which the borrower intended to use the money. [Searles v. Lum, 89 Mo. App. 235; Armstrong v. Bank, supra.] But where it appears that the loan was a mere device of the winner to enable him to recover a gambling debt by the hand of another, courts will pierce through attempted disguises, no matter how cunningly devised, and will refuse to give effect to such subterfuge. [14 Am. and Eng. Ency. of Law (2 Ed.), 642, and cases cited.] And where the lender is not a disinterested party, but has a pecuniary interest of his own to serve through the payment of the illegal debt, his loan is infected with the vice of the original transaction and its repayment will not be enforced.

Is plaintiff in a position to treat defendant's agree-

ment to repay the money as an independent considera-
tion for the loan and, as such, one that is entirely dis-
associated from any illegal consideration? In the first
place, he was conducting a business made unlawful by
the laws of Kansas as well as those of this State (Gen-
eral Statutes, Kansas, 1901, sections 2447 and 2448), and
personally conducted the gambling deals out of which
the debt originated. He was doing this for his own
personal gain and, while it does not appear that any
part of the money he sent the Traders' Grain Company
in payment of defendant's indebtedness represented com-
missions earned by him, it is clear he had a direct pe-
cuniary interest in the payment of that debt. Defend-
ant had proven to be a very profitable customer and
naturally plaintiff desired to retain and encourage his
patronage. The motive prompting the making of the
loan is manifest. In serving his principal, plaintiff was
serving himself and in professing to accommodate his
customer, he was laying the foundation for future gain.
Acting on the theory that defendant's promise to pay
could be enforced as an independent contract, he had
everything to gain and nothing to lose by advancing the
money. Self interest was the mainspring of his action,
an interest to be promoted by further gambling opera-
tions. To give effect to a manipulation of this sort would
tend to defeat the spirit of the statute which as we have
said has for its prime object the suppression of the vice
of gambling in futures. [Connor v. Black, 119 Mo.
126.] As was said in Irwin v. Williar, 110 U. S. 499,
"When the broker is privy to the unlawful design of the
parties and brings them together for the very purpose
of entering into an illegal agreement, he is *particeps
criminis* and cannot recover for services rendered or
losses incurred by himself on behalf of either in forward-
ing the transaction." [Crawford v. Spencer, 92 Mo.
498.] This principle has application to the present case.
The transactions, which resulted in creating a fictitious

debt against defendant, were not in reality closed until the winner realized their fruits, and, in attempting to place defendant in a position where he could be forced to pay an illegal debt, plaintiff certainly was forwarding the transactions to a successful consummation, in which he had, as we have shown, a material interest.

From whatever reasonable standpoint the situation is viewed, plaintiff's act in loaning the money cannot be regarded as being in anywise separated from the gambling deals, but must be held to be part and parcel of them.

It follows that the judgment for defendant must be affirmed. All concur.