MEDLIN MILLING CO. v. MOFFATT COMMISSION CO. et al.

(District Court, W. D. Missouri, W. D. January 9, 1915.)

No. 3691.

1. CORPORATIONS (§ 501*) — ACTIONS — RIGHT TO EQUITABLE RELIEF — ACCOUNTING.

Where an officer of a corporation wrongfully used and lost its funds in certain gambling transactions in grain through defendant commission company, the corporation was entitled to sue in equity to recover the money so lost, because of the trust relationship arising by operation of law and a necessity for an accounting and possible discovery.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1920–1929, 1931, 1932; Dec. Dig. § 501.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. CONSPIRACY (§ 18*)—CIVIL CONSPIRACY—FAILURE OF PROOF.

An allegation of civil conspiracy operates chiefly to affect the introduction of evidence, and to fix liability on parties who would not otherwise be directly liable, so that failure to establish conspiracy, is not ground for abatement; the establishment of liability directly against one or more defendants being sufficient to support an appropriate decree.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 18–24; Dec. Dig. § 18.*]

3. GAMING (§ 14*)—PURCHASE AND SALE OF FUTURES.

At common law a contract for the sale of grain for future delivery, the parties intending that it should not be delivered, but that the obligation should be discharged by a payment of differences, was void as a mere wager; while under Rev. St. Mo. 1909, §§ 4780, 4785, relating to such subject, the contract is void if either party has such intention.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. §§ 25, 26; Dec. Dig. § 14.*]

4. GAMING (§ 14*)—DEALING IN FUTURES.

Commodities may be bought in good faith for future delivery, and if so bought hedging will be permitted to secure those who make contracts in advance against the fluctuations of the market, even though it be expected that such purchase will be satisfied by set-off, instead of by an actual delivery of the grain; the test being the real intention of the parties with respect to actual delivery.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. §§ 25, 26; Dec. Dig. § 14.*]

5. GAMING (§ 11*)—TRANSACTIONS ON BOARD OF TRADE.

Though legitimate operations on Boards of Trade in accordance with the formalities prescribed and established are recognized as valid, the mere adoption of such formulæ, even though operative within such boards to compel delivery, if demanded, will not protect a transaction which does not contemplate such delivery, though clothed in the garb of regularity.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. §§ 19–21, 23, 26; Dec. Dig. § 11.*]

6. CORPORATIONS (§ 426*)—POWERS—CHARTER—ILLEGAL ACTS—DEALING IN FUTURES—ULTRA VIRES.

Where a corporation organized to operate a flour mill, with power to purchase grain necessary for the operation of the mill, etc., it was entitled to buy grain for future delivery, and hedge such bona fide contract when necessary ·to protect itself against the fluctuations of the market; but it had no right to gamble in futures, and such gambling, being prohibited both by the corporation's charter and the policy of the law, and acts of its officers in using its funds for such illegal purpose, were ultra vires, and not binding on the corporation or its stockholders, nor can they be ratified.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1596, 1702–1704, 1707, 1708, 1710–1716; Dec. Dig. § 426.*]

7. CORPORATIONS (§ 487*)—DEFENSES—ULTRA VIRES. .

Where defendant commission corporation, through its regularly constituted officers and agents, permitted a treasurer of plaintiff corporation to use complainant's funds to gamble in futures through the instrumentalities afforded by defendant, and defendant received complainant's funds so unlawfully diverted by its treasurer, defendant could not invoke the doctrine of ultra vires, when sued by complainant to recover the money so diverted, nor escape liability because it had paid out a large part of the fund to others.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1893–1898; Dec. Dig. § 487.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

8. CORPORATIONS (§ 306*)—LIABILITIES—OFFICERS AND DIRECTORS.

Where gambling transactions in futures between complainant's treasurer and defendant corporations were all conducted in the name of defendant as a corporation, and complainant's money lost therein was all received by defendant corporation, a recovery thereof by complainant was limited to defendant corporation, and could not be had as against its officers and directors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1457, 1458; Dec. Dig. § 306.*]

9. PARTIES (§ 6*)—REAL PARTY IN INTEREST.

A corporation, being financially embarrassed by reason of the misuse of its funds by its treasurer in certain gambling transactions in grain through defendant corporation, authorized by resolution the transfer of its cause of action to recover the fund from defendant to one who was a director and its attorney. No formal transfer was made, however, and the resolution was rescinded. *Held*, that such proceedings did not affect the corporation's right to maintain the action to recover the funds in its own name.

[Ed. Note.—For other cases, see Parties, Cent. Dig. §§ 6, 7; Dec. Dig. § 6.*]

At Law. Action by the Medlin Milling Company against the Moffatt Commission Company and others. Decree for complainant.

Scarritt, Scarritt, Jones & Miller, of Kansas City, Mo., for complainant.

Ball & Ryland, of Kansas City, Mo., for defendants.

VAN VALKENBURGH, District Judge. The complainant, a Texas corporation, seeks to recover from the defendants, a grain brokerage company of Kansas City, Mo., and its controlling officers, and one F. M. Rogers, who was treasurer and general manager of the complainant, an amount equivalent to the funds and moneys of the complainant alleged to have been unlawfully, by collusion and conspiracy on the part of the defendants, diverted from the uses and corporate purposes of the complainant, and by the defendants appropriated to unlawful and illegal uses by means of certain wagers or gambling transactions with respect to the rise and fall of future prices of grain. The complainant's charter limits its powers and purposes to those of owning and operating a flour mill and the necessary lands, buildings, machinery, and appliances therefor, and "to purchase grain and other property necessary for the operation of the said mill, and to transact all business incident thereto for the mutual profit and benefit of the stockholders."

The statutes of Missouri relative to contracts for the purchase and sale of grain and other products for future delivery (section 4780, R. S. Mo. 1909) provide:

"All purchases and sales or pretended purchases and sales, or contracts and agreements for the purchase and sale, of the shares of stocks or bonds of any corporation, or petroleum, provisions, cotton, grain or agricultural products whatever, either on margin or otherwise, without any intention of receiving and paying for the property so bought, or of delivering the property so sold, and all the buying or selling or pretended buying or selling of such property on margins or on optional delivery, when the party selling the same, or offering to sell the same, does not intend to have the full amount of the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

property on hand or under his control to deliver upon such sale, or when the party buying any of such property or offering to buy the same does not intend actually to receive the full amount of the same if purchased, are hereby declared to be gambling and unlawful, and the same are hereby prohibited. Any company, copartnership or corporation, or member, officer or agent thereof, or any person found guilty of a violation of the provisions of this section, shall be fined in a sum not less than three hundred dollars nor more than three thousand dollars."

Section 4785 provides:

"All contracts made in violation of section 4780 * * * of this article shall be considered gambling contracts and shall be void."

The trades under review began about the middle of April, and ended about the middle of July, 1910. The first one was arranged between Rogers personally and the defendants as a pretended sale of 10,000 bushels of wheat, and was closed out three days later at a profit. The defendant corporation was a member of the Kansas City Board of Trade, and all the deals were cleared and closed out through what is known as the clearing house of that board. All of the trades through the clearing house were conducted in the name of the defendant corporation and as its business, and all marginal differences were settled by debit and credit to the defendant corporation. As losses would occur, the defendant corporation, acting through its controlling officers, who were also defendants, would draw its draft upon the milling company for the amount of those losses, and Rogers, either personally or by directing some clerk so to do, would draw a check on the funds of the plaintiff corporation in its bank, and so pay the drafts of the defendant corporation. By those means the funds of complainant were transferred to the treasury of the defendant corporation. The source of these funds and the nature of the trades made were well known to the defendants.

Largely as a result of these and similar transactions the plaintiff corporation suffered financial embarrassment, and the situation was revealed to its controlling officers and directors. Shortly thereafter negotiations were had with its creditors looking to a discharge of its indebtedness and to possible rehabilitation. Among other things, a transfer of this cause of action to one D. T. Bomar, a director and counsel of the complainant company was considered. Appropriate resolutions were adopted by the board of directors, and a tentative agreement to that effect was made; but that arrangement and agreement were, prior to the institution of this suit, canceled and annulled, and this action by the corporation was instituted with the assent and approval of all the parties in interest.

Two questions are interposed at the outset: (1) Is the suit properly addressed to a court of equity? (2) Has the conspiracy charge been established, and, if not, what is the resulting effect upon complainant's right to recover?

[1] It would seem that the bill states grounds for equitable relief. Because of the trust relationship, which arises by operation of law, and the necessity for an accounting, and perhaps of discovery, the courts have recognized the propriety of this form of action. Pearce

218 F.—44

et al. v. Dill, 149 Ind. 136, 48 N. E. 788; English v. McIntyre, 29 App. Div. 439, 51 N. Y. Supp. 697; Central Stock & Grain Exchange v. Bendinger, 109 Fed. 926, 48 C. C. A. 726, 56 L. R. A. 875; Cook on Corporations (6th Ed.) vol. 2, pp. 452, 1155.

[2] An allegation of civil conspiracy operates chiefly to affect the introduction of evidence and to fix liability upon parties who would not otherwise be directly liable. The failure to establish it does not abate the suit as in criminal conspiracy, which is the gist of the action. In the former case, the establishment of liability directly against one or more of the defendants is sufficient to support an appropriate decree.

[3] Under the common law a contract for the sale for future delivery of grain or other commodities, the parties to which intend that the goods shall not be delivered, and that the obligation of the contract shall be discharged by the payment of one party to it to the other of the difference between the contract price of the goods at the date fixed for their delivery, is void, because the contract evidences a wager. And under the statutes and decisions of the state of Missouri such a contract is void if either of the parties to it has such an intention. Cleage v. Laidley, 149 Fed. 346, 79 C. C. A. 284.

[4] Of course, grain may be bought in good faith for future delivery; and if so bought in good faith, hedging will be permitted to secure those who make contracts in advance against the fluctuations of the market, even though it be expected that such purchases will be satisfied by set-off, instead of by the actual delivery of the grain. Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236–249, 25 Sup. Ct. 637, 49 L. Ed. 1031. The rule in this state, as well as generally, is laid down by the Kansas City Court of Appeals in Hingston v. Montgomery, 121 Mo. App. 451, 460, 97 S. W. 202, 204:

"The test to be applied in determining whether sales of commodities for future delivery are legitimate business transactions, or are fictitiously made for the purposes of gambling, is to ascertain the real intention of the parties with respect to the actual delivery of the commodity. A person has the right to sell for future delivery a thing he does not own, provided he and his vendee intend at the time that an actual delivery is to be made; and parties to such contracts have the undoubted right afterwards to release each other from performance, either with or without the payment of a consideration by one of them. Such incidents are not uncommon in legitimate business. But the mere making of a written contract under which a delivery or its legal equivalent may be compelled is by no means conclusive of a mutual intention to deliver. The real intention is to be gleaned from all the facts and circumstances, and when it appears that the written agreement is a subterfuge intended to conceal the actual agreement it will be disregarded. Lane v. Logan Grain Co., 105 Mo. App. 215 [79 S. W. 722]."

[5] Legitimate operations on Boards of Trade, in accordance with the formalities prescribed and established by such bodies, are recognized; but the mere adoption of such formulæ, even though operative within such boards to compel delivery, if demanded, will not protect a transaction which does not contemplate such delivery, even though clothed in the garb of regularity. The law looks beyond the form, and deals with the substance of things.

[6] The Medlin Milling Company had the undoubted right to buy

grain for future delivery, and to hedge such bona fide contracts when necessary to protect itself against the fluctuations of the market. It had no right under its charter to gamble in futures, as that term is used and understood in this discussion. Such dealings were clearly ultra vires this corporation, and were prohibited, both because of the restrictions of its charter and the policy of the law. Any acts of its officers or agents, of the kind thus forbidden, are not binding upon it. To this extent they are strangers to it. Neither has the corporation power to ratify such acts, because illegal and immoral in the eyes of the law. Jemison et al. v. Bank, 122 N. Y. 135, 25 N. E. 264, 9 L. R. A. 708, 19 Am. St. Rep. 482; English v. McIntyre, 29 App. Div. 439, 51 N. Y. Supp. 697; Bank v. Edwards, 243 Mo. 553, 147 S. W. 978; McCormick v. Market Bank, 165 U. S. 550, 17 Sup. Ct. 433, 41 L. Ed. 817; Bank v. Kennedy, 167 U. S. 362, 17 Sup. Ct. 831, 42 L. Ed. 198. In McCormick v. Bank, supra, the Supreme Court said:

"The doctrine of ultra vires, by which a contract made by a corporation beyond the scope of its corporate powers is unlawful and void, and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds: The obligation of any one contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders not to be subject to risks which they have never undertaken; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law."

Where, in addition thereto, the act is immoral, as viewed by the expressed policy of the state, the reasoning takes on added strength. The transactions here complained of were conducted by the treasurer of the milling company on the one side, and by the defendant corporation, through its officers named as codefendants, on the other. To my mind the evidence clearly discloses that they were gambling transactions pure and simple. No delivery was contemplated by either party. The grain was not bought and sold for future delivery for the use of the milling company in a legitimate way and to protect it against market fluctuations, but merely for the purpose of closing out the deals upon market quotations. Defendants knew that the funds of complainant were being diverted for this unlawful purpose. The amount thus diverted appears to be $23,362.50.

[7] The doctrine of ultra vires cannot be invoked by the defendant corporation. It dealt in an unlawful manner, through its regularly constituted officers and agents, to the disadvantage of complainant, whose interests were betrayed by its treasurer. It received the funds thus unlawfully diverted. The fact that it may have subsequently paid out a large part thereof to others cannot avail it. Huie v. Allen, 87 Hun, 516, 34 N. Y. Supp. 577; Pearce v. Dill, 149 Ind. 136, 48 N. E. 788; Jemison et al. v. Bank, 122 N. Y. 135, 25 N. E. 264, 9 L. R. A. 708, 19 Am. St. Rep. 482; English v. McIntyre, 29 App. Div. 439, 51 N. Y. Supp. 697; Central Stock & Grain Exchange v. Bendinger, 109 Fed. 926, 48 C. C. A. 726, 56 L. R. A. 875.

[8] Inasmuch, however, as the dealings were conducted in the name of the defendant corporation, and, so far as the record shows, the money was received by it, the recovery should be confined to this de-

fendant, which must be left to deal with its own officers and directors in that regard as the law may permit.

[9] But one consideration remains, and that is whether the plaintiff in this case is the real party in interest. I am of opinion that it is. The conveyances that were contemplated by the action of the board of directors were but steps in a project of liquidation. Various classes of assets were thus allotted to the representatives of different creditors, and, for certain other than these choses in action, the conveyances were actually made and delivered. No such transfer of title was made of these causes of action. It was authorized by resolution; but it sufficiently appears that this action was rescinded. Under the circumstances of this case the mere resolution could not operate effectively to complete the transfer contemplated. The proposed assignee was a director of the complainant company, a relative of its president, and an attorney in charge of its litigation. Nothing was done by the corporation which could not be withdrawn in any event by consent of both parties to the action. Even though title had been vested in Bomar, it might by him have been reconveyed to the company. No formal action to this end was necessary, because no formal transfer had been made. I think there can be no doubt that the complainant has the right to prosecute the action in its own name.

If complainant were an individual, whose funds had been thus employed by an agent without authority, there could be little division as to the law. Are the stockholders of a business corporation less fortunately situated? It is of paramount importance that the funds of such corporation should not be diverted by its agents from their legitimate channels and applied to unauthorized and forbidden uses with knowledge, actual and constructive, of third parties by whom, as broker or principal, the funds thus diverted are received and misapplied. If this remedy does not exist, the law forbidding transactions of the nature here involved is easily susceptible of evasion.

A decree will be entered accordingly.