## JAMES F. GREEN v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, Appellant.

### Division One, April 1, 1908.

1. **NEW TRIAL: Other Reasons.** If there be good reasons appearing on the record for granting a new trial, other than that assigned by the trial court, the order granting it will be upheld.

2. ————: ————: **Erroneous Instructions.** Instructions given for respondent, even if erroneous, unless the record shows that appellant objected and excepted to the giving of them, are not a ground for a new trial or for sustaining the order granting it. But in this case, the instructions are not erroneous.

3. ————: ————: **Misbehavior of Jurors.** Affidavits of jurors, impeaching their conduct and showing them guilty of misbehavior, are not sufficient to sustain a new trial. The verdict cannot be impeached by the jurors themselves.

4. ————: ————: ————: **Affidavit of Plaintiff.** Affidavits of plaintiff and his counsel, to the effect that one of the jurors told his fellow jurymen that he had visited the place where plaintiff was injured during an adjournment, and described to them what he saw, and that thereupon some of the jurors shifted from plaintiff to defendant, without revealing from whom the information was obtained that he had so done, do not authorize the granting of a new trial.

5. **PHYSICIAN: Admission of Patient.** An admission of plaintiff to a staff of hospital physicians and surgeons, to which he had been taken after his injury by defendant's cars, and where his arm was amputated, is not inadmissible, if it related to matters information of which was not necessary to enable them to treat him. In this case such physicians were permitted to testify that plaintiff stated to them: "I wanted to have a passage and I went in between the cars, sat down and the cars backed up on me." They further testified that the hospital was maintained by defendant, and that they were not trying to learn the story of the case as to the injury for the purpose of treatment, that the course of treatment had already been determined upon, and that the statement of plaintiff, whose arm was crushed by the wheel of the backing car, did not affect the course of the treatment, and it is conceded on both sides that the statement was admitted to prove plaintiff's position at the time he was injured, that is, that he was behind stationary cars and could not be seen by the trainmen. *Held*, that it was competent for the physicians to detail this admission, and the trial court erred in granting plaintiff a new trial on the ground that it had been erroneously admitted.

6. **EVIDENCE: Objections: No Exceptions Saved in Record.** Although the trial court has an established rule, known by all the attorneys, that where an objection is made to evidence an adverse ruling thereon is to be considered as also' excepted to, yet it is necessary that the record on appeal show that such exceptions were saved at the time. But in this case, where plaintiff made specific objections, and the court nevertheless admitted the evidence but afterwards granted him a new trial on the ground that such evidence was erroneously admitted, and defendant appeals from that order, the rule is relaxed on the theory that the trial court presumably saw the exceptions in his mind's eye, and in order that the matter may be considered on its merits.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor,* Judge.

REVERSED AND REMANDED (*with directions*).

*J. E. McKeighan* and *Wm. R. Gentry* for appellant.

(1) The ruling of the court, in sustaining plaintiff's motion for a new trial, on the ground that the court had committed error in the admission of the testimony of physicians, inasmuch as the court concluded that their testimony was privileged, was erroneous. The communication testified to was not privileged. Brown v. Railroad, 45 Hun 439; People ex rel. v. Abrahams, 96 App. Div. 27; People v. Cole, 113 Mich. 83; Collins v. Mack, 31 Ark. 684; State v. Kennedy, 177 Mo. 129; James v. Kansas City, 85 Mo. App. 24; Linz v. Ins. Co., 8 Mo. App. 363; State v. Spaugh, 200 Mo. 571; Hamilton v. Crow, 175 Mo. 634; Holloway v. Kansas City, 184 Mo. 19; Murphy v. Comrs., 83 Pac. 577; Pearson v. People, 79 N. Y. 432; Railroad v. Yates, 67 Ala. 167; Rinz v. Dow, 113 Cal. 490; Stone v. Minter, 111 Ga. 45; Deuser v. Hamilton, 52 Mo. App. 394; Deuser v. Walker, 43 Mo. App. 625; Weinstein v. Reed, 25 Mo. App. 49; Campau v. North, 39 Mich. 606; Green v. Railroad, 171 N. Y. 201; People v. Koerner, 154 N. Y. 355; Benjamin v. Village of

Upper Lake, 110 App. Div. 428; Railroad v. Murray, 55 Kan. 336; 3 Jones on Ev., sec. 778; 4 Wigmore on Ev., p. 3351. (2) The motion for a new trial ought not to have been sustained, even if the communication to the physicians was improperly admitted in evidence. The plaintiff having had the case submitted to the jury, had already received more consideration at the hands of the court than he was entitled to, since his own testimony showed that he was guilty of contributory negligence which was the proximate cause of his injury. Zumault v. Railroads, 175 Mo. 288; Burde v. Railroad, 100 S. W. 509; Harper v. Railroad, 187 Mo. 575. (3) The motion for a new trial ought not to have been sustained, even if the court should hold that the plaintiff was entitled to have the case submitted to the jury. It is apparent, even from the cold print in the record of this case, that the verdict was for the right party, and that, on the plaintiff's own testimony, no jury would be justified in believing his version of the case.

*S. P. Bond* for respondent.

(1) The court was right in granting plaintiff a new trial, as it was error to allow the assistant physicians and surgeons to testify when called by the defendant concerning any information which they may have acquired from the plaintiff while attending him in a professional character on the day of his injuries over and against plaintiff's objection made and saved at the trial, because anything they learned was a privileged communication between plaintiff and his physicians. Gartside v. Ins. Co., 76 Mo. 452; Groll v. Tower, 85 Mo. 255; Carrington v. St. Louis, 89 Mo. 216; Thompson v. Ish, 99 Mo. 174; Morton v. Moberly, 18 Mo. App. 459; Streeter v. Breckenridge, 23 Mo. App. 252; Corbett v. Railroad, 26 Mo. App. 626; King v. Kansas City, 27 Mo. App. 247; Weitz v. Railroad, 33 Mo. App. 44; Evans v. Trenton, 112 Mo. 404;

Mellor v. Railroad, 105 Mo. 460; Howarth v. Railroad, 94 Mo. App. 225; State v. Kennedy, 177 Mo. 127; James v. Kansas City, 85 Mo. App. 23; Glasgow v. Railroad, 191 Mo. 358; Frief v. Railroad, 97 Cal. 47; Raymond v. Railroad, 65 Iowa 154; Halloway v. Kansas City, 184 Mo. 19. (2) The court did not err in submitting the case to the jury under the testimony and law of the case, because where there is a reason to apprehend that the track may not be clear, the persons in charge of a railroad train can not act on the presumption that the track is clear without the company being responsible for the consequences, and this is true notwithstanding the person is a trespasser and the company's right to have a clear track. However, plaintiff was not a trespasser in defendant's yards. Chamberlain v. Railroad, 133 Mo. 603; Tearson v. Railroad, 79 S. W. 400; Morgan v. Railroad, 159 Mo. 282; Klockenbrink v. Railroad, 172 Mo. 688; Dunkman v. Railroad, 95 Mo. 244; Merz v. Railroad, 88 Mo. 673; Kelley v. Railroad, 104 Mo. 389; Bunyan v. Railroad, 127 Mo. 12; Czezewzka v. Railroad, 121 Mo. 201. (a) The court erred in giving the defendant's first instruction marked "A," because where the answer alleges a specific act of negligence on the part of the plaintiff as the ground of defendant's defense, there can be no defense for another act not pleaded in its answer. Chitty v. Railroad, 148 Mo. 73; Crawford v. Aultman & Co., 139 Mo. 271. (b) And the court further erred in giving defendant's second instruction marked "B," because it is in conflict with plaintiff's second and third instructions, which correctly declare the law. (3) It was irregular and unlawful for the juror to visit the scene of the accident. Daud v. Guthrie, 13 Ill. App. 659; Stampopski v. Steffins, 79 Ill. 303; State v. Berlin, 24 La. Ann. 46; State v. Sanders, 68 Mo. 206; Eastwood v. People, 3 Park. Crim. Rep. 54; State v. Lopez, 15 Nev. 407.

LAMM, J.—Plaintiff sued for the loss of his left arm, grounding his right of action on the alleged negligence of defendant, and putting his damages at $20,000. The cause was tried with the aid of a jury. A verdict going for defendant, plaintiff filed his motion for a new trial, and from an order granting one defendant appeals.

The following ordinance was in force in the city of St. Louis at the times in hand:

"It shall not be lawful within the limits of the city of St. Louis for any car, cars or locomotive propelled by steam power to obstruct any street crossing by standing thereon longer than five minutes, and when moving the bell of the engine shall be constantly sounded within said limits, and if any freight car, cars or locomotive propelled by steam power be backing within said limits, a man shall be stationed on top of the car at the end of the train fartherest from the engine, to give danger signals, and no freight train shall at any time be moved within the city limits unless it be well manned with experienced brakemen at their posts, who shall be so stationed as to see the danger signals and hear the signals from the engine. The steam whistles of danger shall in no case be sounded except in giving the usual signals for running trains."

The cause of action is predicated of violations of certain provisions of the foregoing ordinance, viz., (1) in regard to sounding a bell, (2) in regard to stationing a man on a backing train on top of the car at the end farthest from the engine and (3) in regard to the train being well-manned with experienced brakemen.

The petition alleges that on the 29th day of July 1904, while plaintiff was "along, upon and near" defendant's railroad tracks in its yards between Tenth and Twelfth streets in the city of St. Louis, at a

point where defendant's tracks are frequented and used by many pedestrians at all times of the day, he was run over and hurt by a freight train "being shunted or backed and propelled by a locomotive engine belonging to defendant." That an amputation of his arm resulted from the injury so received. That such injury was directly caused by the carelessness and negligence of defendant's agents and servants in charge of said locomotive and train of cars to keep a proper lookout for persons upon or near said tracks when by so doing they could have prevented said freight train from running over plaintiff. The ordinance aforesaid is pleaded and sufficient allegations are made relating to a negligent omission to obey it, in the particulars aforesaid, and it is averred that each and all of said omissions directly contributed to plaintiff's injury.

The cause was tried on an amended answer, coupling a general denial to an affirmative plea of contributory negligence, to the effect that plaintiff went into defendant's yards and negligently placed himself so near one of the defendant's tracks that there was not sufficient room for a train to pass over such track without striking his person. That plaintiff negligently continued to occupy such position and failed to exercise ordinary care to look and listen for the approach of trains and engines or to get out of the way of them.

The reply was conventional.

The evidence tended to show as follows:

The scene of the accident was defendant's switching yards between Tenth and Eleventh streets in the city of St. Louis. There was a cluster of tracks there used by defendant in shifting and switching cars to be cut out of and made into trains, and to unload and load them. This use was constant, the yards were a place of great activity and danger and it might be

expected that cars would be moved every few minutes. Only one of said tracks concerns us, and that is a single track running east and west between two raised platforms—both used for freight purposes. These platforms were at such a height above the ground that the tops of them were even with the floor of freight cars and were open underneath. The evidence varies somewhat on their height. Some of the witnesses for plaintiff, estimating, put it at from two and one-half to three and one-half feet. The actual measurement by defendant's engineer showed the height to be from four feet to four feet and four inches. The north platform ran along the rear of a freight house, was used in connection with it and (as we understand it) this freight house fronted on Poplar street. The time of the accident was between six and seven o'clock of the morning of July 29, 1904. It was hours after broad daylight—a bright, dry morning. Looking east from the east end of either platform on that morning, the track in question was unobstructed for 600 feet. Looking west the track was obstructed by a string of freight cars standing between the platforms. The most eastern one of these cars was quite a distance west of the east ends of the platforms, thus leaving a space between them toward the east unoccupied. When cars stand in this space it was so fully occupied that, say, only 20 inches were left free between the sides of the cars and the edges of the platforms. It appears that a man squatted outside of either rail would have difficulty in wedging himself between the car and the adjacent platform. The following diagram will aid the description of the *locus in quo*. It was put in evidence, shows a freight car located on the track between the two platforms, is drawn to a scale and shows the distance from the rail to the platform, the distance of the body of a car to the edge of the platform, and the height of the platform itself.

It was shown that a man could get under these platforms and sit on his hams, although ashes and other debris were there, and it was not a wholesome or inviting spot. A man in a squatting position along the southern platform close to the track could see south under the platform and across defendant's yards. Plaintiff was in a squatted position, and, as tending to show his height when in that position as compared to that of the platform, the following questions asked him by his counsel and answers made are in point:

"Q. You were in that three feet space? A. Yes, sir.

"Q. Which way were you facing? A. I was facing south.

"Q. In other words, you were facing in under the platform, were you? A. Facing just as I am looking now, the platform and this table in the exact position right here (illustrating).

"Q. Looking under the platform? A. Looking under the platform, yes.

"Q. Was the platform enclosed the other side or could you see? A. I could see, could see through.

"Q. Could see all the way across the yards from the position you were in? A. Yes, sir."

Plaintiff was a laborer and was a member of a working force employed by defendant in East St. Louis. This force was carried to its work on a work-train starting from somewhere near the place of the accident each morning. Plaintiff had been in defendant's employ for less than a month and on the morning in question came to the rendezvous of his companions at the south side of the south platform. There receiving a call of nature, he left his companions seated on a pile of ties or lumber and walked east and then around the east end of the south platform, then west along the north side of the south platform

a certain distance and, sitting with his face to the south platform, remained squat on his hams for two, three or four minutes with his clothes disarranged. West of him (according to his testimony) was the standing string of freight cars a few feet away. East of him were 600 feet of unobstructed track. To his back was the track and the freight house platform. He says he did not get under the platform, nor was he concealed between the platform and the standing cars or between any two of said cars, but squatted in the open between the rails of the track or between the south rail of the track and the south platform. He seems to have anticipated no danger from the west, but did from the east. Accordingly he looked east before and after he sat down to assure himself. He put in testimony from certain of his co-laborers tending to corroborate his statement that he was in the open space east of the string of standing cars, and, while in the position described, a train of cars backed in from the east very slowly—slower than a man would walk—without ringing a bell, with no brakeman on the car farthest from the engine or otherwise manning the train, and ran him down, throwing him under the west car of the backing train between the rails, and ground off his left arm under a car wheel.

On the other hand, defendant introduced testimony of great weight and reasonableness tending to show that plaintiff was nowhere in sight. That he went in between the standing cars and the platform, or between two of the standing cars, so that he could not be seen, and there was caught by the backing train bumping against the dead cars. It was shown that blood was found on the wheel of one of three standing cars, no other blood was found on any other wheel; that the switching crew were walking along the backing train in a situation to give proper signals to

each other and the engineer and see plaintiff if in the open; that one of the crew walked in advance of the train and so stationed himself that he could attend to coupling the train to the standing cars when the impact came; and that plaintiff was not in sight though the switchman was within a few feet of where plaintiff puts himself. It was shown that the cars did not couple by the first impact and the standing cars were thus bumped west aways, and then for the first time plaintiff was heard screaming to the west where the standing cars were.

Plaintiff made a written statement to defendant's claim agent shortly after the accident. This statement was identified by the claim agent who testified it was made voluntarily and understandingly and signed by plaintiff. It was then put in evidence, describing the events leading up to the injury and plaintiff's location at the time precisely as indicated by defendant's testimony. Plaintiff, however, testified that he knew nothing about this statement and was not in a condition to know anything about it at the time it was made and signed. It was in evidence that a train of cars moving at the rate of this train and on a track in the condition of this track could be stopped in a very few feet. Plaintiff in rebuttal introduced testimony in contradiction to that of defendant's switching crew as to their respective situations with the backing train and their positions at the time of the accident.

There was scanty evidence that persons (chiefly employees of defendant) used the track in question as a passway between the platforms. There was no testimony that it was in general use by the public as a passway and no testimony that it was or could be so used when occupied by freight cars, as it was at the time of plaintiff's injury. The testimony is the other way. Two or three of plaintiff's witnesses had used

the track between these platforms once or oftener for the same humble purpose plaintiff was using it when hurt, and possibly another witness for plaintiff had seen it used that way a time or two, but there was no evidence that this portion of defendant's track was generally used as a privy to the knowledge of defendant's officers and servants in charge of its tracks and switching yard.

Plaintiff was taken to St. Mary's Hospital and there received surgical attention. At that time he made a statement to the attending surgeons to the effect that: "I wanted to have a passage and I went in between the cars, sat down and the cars backed up on me." Defendant, over the objection of plaintiff, was allowed to prove this statement by the attending surgeons. Plaintiff's counsel excepted to this evidence and claimed error on this ruling in his motion for a new trial, and the trial court was of opinion that error was committed in that behalf, and on that account set the verdict aside.

Any other facts necessary to the determination of the case will appear in the opinion.

I. Attending to the one reason assigned, *nisi*, for granting a new trial, plaintiff's learned counsel invokes the doctrine that even if we should hold there was no error in admitting the surgeon's testimony in the foregoing particular, yet, if there be other good reasons appearing on the record, the order granting one should be affirmed. This is so. Courts are organized to get practical and just results in the administration of law; therefore, if the right thing be done (though a wrong reason be given for doing it) the thing itself may stand. The rule is sensible. It establishes a working theory steadily applied by appellate courts. [Mockowik v. Railroad, 196 Mo. l. c. 568; Smart v. Kansas City, 208 Mo. 162.]

(a) Under this head counsel argues there was

error in giving two instructions for defendant, marked "A" and "B." Instruction "A," counsel argues, goes outside of the answer in outlining the defense, for that the answer alleges a specific act of negligence on the part of plaintiff and the instruction deals with an act of negligence not pleaded in the answer. It is argued, further, that instruction "B" conflicts with plaintiff's second and third instructions, which in turn correctly declare the law. If these criticisms were admitted sound, nevertheless they could avail plaintiff nothing on this appeal, because the record does not show that plaintiff objected or excepted to the giving of any instructions for defendant. In the absence of such objection or exception, plaintiff waived the error, if any, and the trial court would not have been warranted in convicting itself of error in that regard, nor should the order granting a new trial stand on such ground. However, the matter need not pass off on a technicality; for we have looked into the merits and find no substance. The point is ruled against plaintiff.

(b) Under this head, plaintiff further contends that the jury misbehaved and a new trial was due him on that score. It is attempted to impeach the verdict by the affidavits of jurors.

In Devoy v. Railroad, 192 Mo. l. c. 218-9, it was said: "Our decisions are rich with learning showing solid reasons for the aversion of courts to allow the impeachment of a verdict by affidavits of jurors lifting the veil of the jury room, disclosing its secrets and perpetuating its animosities. See, for example, Pratte v. Coffman, 33 Mo. l. c. 77, et seq., and a current of authority following that case."

What was said in the Devoy case disposes of the affidavits of the jurors, but plaintiff filed the affidavit of himself and his counsel in aid of the jurors' affidavits. We have examined them with care. The fact

complained of in all the affidavits is that a certain
juryman told his fellows in consultation that he had
visited the place of the accident during an adjourn-
ment of the case and described what he saw there.　It
is stated that after this recital some of the jurymen
shifted from plaintiff to defendant.　The affidavit of
plaintiff and his counsel do not state as a fact that the
juryman in question actually visited the *locus* after
the adjournment of court and after the submission of
the case.　There is nothing here showing this juryman
did that thing or actually acquired information out-
side of the sworn testimony.　The affidavits tell what
the juryman said to his fellows and end there.　How
this information came to plaintiff or his counsel is
not shown.　If it came from any other than a jury-
man, the affidavit of that person should have been
produced.　If it came from a juryman, certainly the
information at second hand ought not to have more
force than if it came from first hand, to-wit, in an af-
fidavit from a juryman himself.　The point is ruled
against plaintiff.

II.　Did the trial court err in admitting the sur-
geons' evidence?　This is the main question in the
case—a bone of contention most learnedly picked by
counsel.　It arose at the trial in the examination of
one of the house surgeons of St. Mary's Hospital—
Dr. Vandover.　It seems St. Mary's Hospital was
used by defendant company for the benefit of its em-
ployees needing medical or surgical aid.　It seems
the surgeons of St. Mary's take statements from de-
fendant's employees who are brought to the hospital
on facts relating to injuries, make out reports and
send them to defendant's officers.　When Dr. Vand-
over was on the stand he was asked if plaintiff had
made this statement:　"I wanted to have a passage
and I went in between the cars, sat down and the cars
backed up on me?"　The question went to the vitals

of the case; for if plaintiff was in the open (as he testified) where he could be seen, it might be that one rule of law would be applied; if, to the contrary, he was (by his own admissions) hid away where he could not be seen, another rule might be applied. The case is submitted here by counsel on the theory that the law would be one way in one case and the other way in the other case; therefore, we may assume that to be so. To the question plaintiff's counsel objected generally and asked the privilege of cross-examining the witness before he answered. It developed in such cross-examination that at the time of his injury plaintiff was a member of the Hospital Association of the Terminal Employees and that St. Mary's Hospital had charge of that work. Plaintiff's counsel then lodged the following objection: "That he (meaning the surgeon) is incompetent to answer any questions as presented there." The witness was not allowed to answer the question for the present. Thereupon there was questioning in which Mr. Gentry, for defendant, Mr. Bond, for plaintiff, and the court itself took a hand. It was developed thereby that plaintiff made the statement to Dr. Nichols, one of the four surgeons present in the operating room, three of them being assistants to the chief surgeon—Dr. McCandless. Plaintiff was not told in so many words that the surgeons were acting as in the pay of and for the Terminal Railroad Association; presumably plaintiff knew that. It appeared that the surgeons were not trying at the time to learn the story of the case as to the injury for the purpose of treatment. In response to a question directed to that fact, Dr. Vandover replied: "No, they were not; the injury was self-evident, treatment was the same under any circumstances." He further testified that the course of treatment for the injury had been already determined upon by the surgeons in charge of the case; that there could be only one course

of treatment and it was self-evident; that the statement by the plaintiff did not affect the course of treatment; and that it was not necessary for the surgeon to know the position of plaintiff when he was injured in order to act. So much appearing, the objection made by plaintiff's counsel to the testimony of the surgeon was overruled, and the witness testified that plaintiff made the statement charged to him and hereinbefore set forth. We do not see from the printed record that any exception was saved by plaintiff's counsel to the overruling of his objection to that testimony. On cross-examination witness again testified the inquiry made of plaintiff was not necessary for his treatment. That it was made in order to fill out a form for a surgeon's report due defendant company, and was written down. The witness thought plaintiff signed it. The same testimony was offered by defendant from Doctor Nichols, another house surgeon present at the time, and referred to by Dr. Vandover. To his testimony it was objected that "it was entirely incompetent, is a privileged communication between the physician and the plaintiff." This objection was overruled and the witness testified to plaintiff's statement. Again we do not see from the printed record that any exception was saved to the ruling of the court. Under the conditions shown, Dr. Wilson, another house surgeon, testified to the same effect. To an interrogatory propounded to him, the objection finally made by plaintiff's counsel was as follows: "We wish to object to the Doctor's testimony on the ground that it is a privileged communication, any communication that Green might have made at the time, any communication between the physician and the plaintiff, is entirely incompetent for any purpose." This objection was overruled and again we do not see that any exception was saved.

The absence of exception doubtless came from the announcement made by the trial judge while the first witness was on the stand, viz.:    "I will state to the gentlemen for their convenience that exceptions are presumed to be taken to all adverse rulings; that will save the trouble of excepting.    That is, in the trial of the case and in the examination of the jury, all through the trial of the case, when you make an objection and the court overrules it you are presumed to have taken your exception; if the court sustains it, the other side is entitled to an exception."

That ruling is of doubtful value in the trial of a case and ought to be of no force at all in an appellate court.    Obviously, when a case reaches the point where a bill of exceptions is to be made, all exceptions intended to be relied on should be inserted in the bill. They cannot be hid under the cloak of an arbitrary presumption indulged below and be got at by inference.    If this were plaintiff's appeal from a judgment against him the absence of his exceptions would be fatal to his contention; but as it is defendant's appeal and as the trial court presumably acted under its own ruling and saw the exception in its mind's eye though none was made, and undertook to correct what it believed its own error, the question is presented in another form and we may with propriety consider the matter on its merits.

Section 4659, Revised Statutes 1899, is as follows (omitting provisions not material here):    "The following persons shall be incompetent to testify: First, . . . . . Second, . . . . . Third, . . . . Fourth, . . . . . . Fifth, A physician or surgeon, concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon."

This statute creates a privilege unknown to the common law. [23 Am. and Eng. Ency. Law (2 Ed.), 83.] In that particular, it stands on a different foot than a similar privilege relating to an attorney and client. As shown by a table prepared by Judge Jacob Klein and inserted as a note to Gartside v. Insurance Co., 76 Mo. 1. c. 452, such statute was first enacted in New York in 1828 and next in Missouri in 1835—the Missouri statute being substantially a copy of that of New York. A similar statute was adopted in Michigan in 1846 and it is not without significance that this court has levied tribute time and again on adjudications of the higher courts of those two states in interpreting our own statute. See, for example, Gartside v. Ins. Co., 76 Mo., *supra*, 1. c. 451; Groll v. Tower, 85 Mo. 1. c. 254, *et seq.;* Thompson v. Ish, 99 Mo. 174, *et seq.*

Though in derogation of the common law, courts have not applied the rule of strict construction sometimes applied to statutes of that character. To the contrary, the right doctrine seems to be that the policy of the statute is an elevated one. It was intended to invite confidence between patient and physician and to prevent a breach of such confidence, and should be so construed as to further its life and purpose. It is obvious, the language of the statute is of such sort that its interpretation and application are troublesome. But, because the task is difficult, shall it be made easy by ignoring it? or by applying the statute automatically to every case and all information? On the one hand, it might be so construed as to fritter away the provisions of the law. On the other hand, it might be so literally construed as to work great mischief in the administration of justice. The ultimate object of every judicial inquiry is to get at the truth. Therefore, no rule of law standing in the way of getting at the truth should be loosely or mechanically applied. The application of such law must be with discrimination so

that it may have the legislative effect intended for it and yet the investigation of truth be not unnecessarily thwarted. Evidently the Legislature had these considerations in mind, for the language used in section 4659, *supra,* plainly restricts the privilege created. The statute does not say, in effect, that the door of the sick room shall be locked once for all. It does not say, in effect, the mouth of the physician or surgeon shall be closed once for all. The wise general rule being that the admissions of a party to a suit, made outside the court room, are admissible in evidence against him, the statute does not say that all such admissions made to a physician or surgeon are privileged. It stands precisely the other way. The information under its ban is not *all* information acquired from a patient but is such only as was *"necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon."* These are clear words in the law and under no canon of construction should they be interpreted out of the law by refinement, or because of fanciful ills. In other words, the danger of frittering away this statute is not to operate as a scarecrow frightening courts from their duty to give to every word of it a due office and meaning—being zealous and astute at all times to see to it that the statute be so construed as not to strike down its obvious purpose. To this delicate and discriminating task courts have addressed themselves; for instance:

In Pierson v. People, 79 N. Y. l. c. 433, it was said: "The purpose was to enable a patient to make such disclosures to his physician as to his ailments, under the seal of confidence, as would enable the physician intelligently to prescribe for him; to invite confidence between physician and patient, and to prevent a breach thereof. [Edington v. Insurance Co., 67 N. Y. 185, 77 *id.* 564.] There has been considerable difficulty

in construing this statute, and yet it has not been under consideration in many reported cases. It was more fully considered in the Edington case than in any other or all others. It may be so literally construed as to work great mischief, and yet its scope may be so limited by the courts as to subserve the beneficial ends designed without blocking the way of justice.''

The same court in Griffiths v. Railroad, 171 N. Y. 106, and in the same volume, Green v. Railroad, p. 201 has laid down a doctrine which, as will presently be seen, accords with the doctrine of this court. In the Griffiths case, WERNER, J., said this: ''We think there is enough in the record to indicate that the court ruled out all evidence of the witness as to any conversation he had with the plaintiff concerning the details of the accident and how it occurred. To bring the evidence of a physician within the prohibition of the Code section above quoted, three elements must coincide: (1) The relation of physician and patient must exist. (2) The information must be acquired while attending the patient. (3) The information must be necessary to enable the physician to act in that capacity. Upon the evidence disclosed by the record, it is doubtful whether either of these requisites was established in the case at bar.''

In the Green case, GRAY, J., speaking, said: It will be observed that the question called for no information, which was acquired by the surgeon to enable him to act as such. It called for evidence, merely, of what preceded, and had caused, the accident according to the plaintiff's knowledge. Section 834 of the Code of Civil Procedure, whose privilege has been extended to cover this question, applies, by its language, to cases where information has been acquired by a physician, or to a surgeon, while 'attending a patient in a professional capacity, and which *was nec-*

*essary to enable him to act in that capacity.'* We may
readily admit that Dr. Moorhead acquired the infor-
mation, which the question called for, while attend-
ing the plaintiff in a professional capacity, and, still,
we would be far from the point of the legislative pur-
pose in enacting the section of the Code. That was
that the information should be of a character neces-
sary to enable Dr. Moorhead, or the hospital staff,
to act professionally upon the case. As it was observed
In Edington v. Aetna Life Ins. Co. (77 N. Y. 564),
'it is not sufficient to authorize the exclusion that
the physician acquired the information while attend-
ing the patient; but it must be the necessary informa-
tion mentioned.' The object of the statute, as we are
bound to presume, was the accomplishment of a just
and salutary purpose; which was that the relations
between physician and patient should . be protected
against public disclosure, so that the patient might
unbosom himself, freely, to his medical adviser and,
thus, receive the full benefit of his professional skill.
Surely, it could not have been intended that any truth-
ful version of a narrative of the events leading to
an accidental injury should be excluded, and that was
all the question called for, as it had come from the
sufferer's lips, and when fresh in his recollection. It
is rather more consonant with the requirements of
justice that no witness should be prevented from giv-
ing such evidence.''

The New York court in those cases, in one par-
ticular, went further possibly than this court has gone
in regard to the burden of proof. It held that the
burden was on plaintiff to show that the testimony
was privileged and came within the provisions of the
statute. This court has indicated that there was a
presumption the other way. But, as will be seen pres-
ently, we are in accord with the New York court in
holding that the law must be applied with discrimina-

tion and that all information given by the patient to the physician is not privileged, but that the privilege extends only to information of the character mentioned in the statute.

The rule in Michigan is the same way. At a time when that Bench held a COOLEY and a CAMPBELL, the case of Campau v. North, 39 Mich. 606, came before it for decision. Miss North was a nurse. She sued Campau for personal injuries. At the trial the court excluded certain testimony from Doctor Lichty, her physician. Plaintiff claimed she was ruptured by blows and other acts of violence while acting as Campau's nurse. He called Lichty and sought to prove by him that while he was attending her in a professional capacity, she told him that she had been ruptured before she went to live with plaintiff and had not been ruptured by him. The question was objected to and the trial court sustained the objection. It is not necessary to set forth the Michigan statute. It is substantially ours and we have so decided in other cases. In disposing of the point on appeal, it was held that the exclusion of that testimony was error. The court said: "The objection and ruling were based on the statute. The common law gives no privilege in such a case. [Citing authorities.] The rule given by the statute is beneficial and based on elevated grounds of policy, and it ought not to be frittered away by refinements. It is not to be forgotten, however, that parties have their rights, and that when one takes the stand as witness to establish by his or her oath the cause of action alleged, the state of facts to give immunity under the statute ought to appear distinctly before making any exclusion of proof of contradictory admissions. So far as practicable the courts ought to see to it that the statute is not used as a mere guard against exposure of the untruth of a party, and that a rule intended as a shield is not turned into a sword.

The objection in the present case was not warranted by the facts in the record. The offer was to show Miss North's admission that her rupture was not caused by plaintiff in error but existed before she went to live with him. This was material, and it does not appear in the record from the doctor's testimony or in any way that in case she made the admission as to the pre-existence of the rupture, and as to its not being caused by plaintiff in error, it was information 'necessary to enable the doctor to prescribe for her as a physician or to do any act for her as a surgeon.' And yet this is one of the fundamental conditions for exclusion which the statute specifies." That case has been followed in Cooley v. Foltz, 85 Mich. 47, and in People v. Cole, 113 Mich. 83.

The same doctrine is announced in Arkansas in interpreting a statute similar to ours. [Collins v. Mack, 31 Ark. 684.] In that case this appears: "Appellant called as a witness Dr. Joshua Henly, who testified that he was a practicing physician, and was called to attend appellee in her confinement at the time she was delivered of the child spoken of by her in her testimony. Appellant offered to prove by this witness that during said visit and attendance, and about six hours after she was delivered of her child, appellee told witness that she and appellant never had been engaged, and that he never had promised to marry her. Upon the objection of appellee, the court excluded this evidence, but upon what ground, does not appear in the transcript. Not, surely, on the ground that the admission was a confidential communication to the witness, necessary to enable him to prescribe for appellee as a physician, or to do any act for her as a surgeon (Gantt's Digest, sec. 2485), for her statement to him was not of that character."

In Kansas, the same rule obtains in interpreting a somewhat similar statute. In Railroad v. Murray,

55 Kan. 336, in following the Michigan decisions, JOHNSTON, J., said: "The statute does not cover communications made by the patient other than those that relate to the disease or ailment for which the physician was called to prescribe or the surgeon to treat. The declarations inquired about in this case did not relate to the physical ailment of Murray, but were with reference to the circumstances preceding the injury. They were not of a confidential character, and were not necessary to enable the doctor to prescribe or to perform any professional duty for him as a surgeon. In Michigan it was held proper for a plaintiff's physician to testify that when called in professionally he was told by the plaintiff that she had sued the defendant and would want him as a witness, since said testimony had no reference to plaintiff's condition. [Cooley v. Foltz, 85 Mich. 47.] . . . The exclusion of this testimony was material error, which requires a reversal of the judgment and a new trial of the case."

Cases announcing a somewhat different view may be found, but as a rule they take color from peculiar statutory provisions under exposition.

Coming to our own courts, in Weitz v. Railroad, 53 Mo. App. 39, Judge ROMBAUER, referring to the distinction we have been considering, said: "We concede that, in order that such knowledge should be protected, the relation of patient and physician must exist, at least to the extent of impressing the patient with that belief. [Citing cases.] The words in the statute, 'attending him,' necessarily imply that limitation. We further concede that even the attending physician is not disqualified from testifying as to facts which he learned from the patient touching the condition of the latter, and which were in no way necessary to enable the physician to treat the patient. [Campau v. North, 39 Mich. 606.] . . ."

In James v. Kansas City, 85 Mo. App. 1. c. 24, SMITH, P. J., used this language: "An attending physician or surgeon is not disqualified to testify as to facts which he learned from his patient touching the latter's condition which were in no way necessary to enable him to treat such latter."

It was held in both the foregoing cases that the burden of showing the disqualification rests on the party objecting to the testimony, but that may not be the rule deducible from our own decisions when once the relation of physician and patient is established. [See the Kennedy case, *infra.*]

The tendency of this court to give such construction to this statute as will confine it within reasonable bounds is indicated in Thompson v. Ish, 99 Mo. 160, where it was held that either the heirs or devisees may waive the privilege and call the attending physician of the deceased as a witness on the issue of testamentary capacity.

In State v. Kennedy, 177 Mo. 98, the statute was under discussion and BURGESS, J., for Division Two of this court, said (p. 129): "We take it that the physician or surgeon must, as a general rule, under the statute, determine for himself whether the information acquired by him from his patient is necessary for him to prescribe for such patient, and in the absence of some showing to the contrary, as in the case at bar, the presumption must be indulged that the information in question was necessary for that purpose; otherwise, he would not desire it. To rule otherwise would be to usurp the prerogative of a physician, learned in his profession, which we have no inclination or right to do. We, of course, do not mean to say that we will not pass upon questions which are apparent to the ordinary observer, and to one not learned in the sciences of medicine and surgery, which have

nothing whatever to do with the case under consideration, and hold them not privileged."

In the Kennedy case, Edington v. Insurance Co., 67 N. Y. 194, was quoted from approvingly and the doctrine of that case is referred to in the New York cases heretofore cited.

In Hamilton v. Crowe, 175 Mo. 634, GANTT, J., in discussing the admissibility of a physician's testimony said, *arguendo,* "It is obvious that this witness was not testifying to any information which he acquired as a physician from a patient. He was not consulted as a physician, and the *information was not necessary to enable him to prescribe for her as such.*"

In Holloway v. Kansas City, 184 Mo. 19, the matter in hand was under exposition. In that case it was held there was no waiver of the statutory privilege because plaintiff had testified to part of the conversation she had with her doctor. As pointed out, it was not "information necessary for the physician to enable him to prescribe for such a patient as a physician, or to do any act for him as a surgeon." To the contrary, "it was purely a conversation in regard to plaintiff's doctor bill or in regard to the contemplated law suit." The court then cited the case of James v. Kansas City, 85 Mo. App., *supra,* to the effect that: "such incompetency does not touch facts which are in no way necessary for that purpose." Recurring to the matter again, the court said (p. 44): "But we are not to be understood by these observations as meaning or intimating that Dr. Van Eman was not competent to testify as a witness to what plaintiff said to him, if anything, in regard to bringing suit against defendant for damages, and if she would go into it they would be able to fix up his bill against her. Such statements were not within the meaning of the statute under consideration."

In the light of our own decisions, we have come

to the conclusion that the evidence admitted from the surgeons of St. Mary's was competent. It was not admitted to prove that plaintiff's arm had been ground off by a wheel as against an injury by a sharp instrument. That fact stood conceded in the case. It was not admitted to prove that plaintiff was sitting down when struck. All sides conceded that. This was not a case where the location or direction of a wound, such as a gunshot wound, would be determined by the position of the wounded party and possibly material for the surgeon to know. It was admitted to prove that plaintiff was not in the open where he could be seen, but was between the cars when the backing train collided with the standing cars—that is, he was concealed —precisely as his statement made to the claim agent showed and precisely as defendant's other evidence tended to show, and *contra* to his evidence at the trial. A case might be imagined where the method by which a man lost his arm was an element essential to correct surgical or medical treatment, but no case can be imagined within the realm of sense where surgical or medical treatment in any wise depended upon whether a man was squatted in an open place or squatted in a concealed place when hurt. The surgeons testified they did not need and did not acquire the information for surgical purposes. It stood, then, nakedly as an admission and without privilege under the Missouri rule. Hence, the testimony was admissible, and the court was not justified in disturbing the verdict because the testimony was let in.

III. Conceding plaintiff was a licensee, yet there was no such pronounced user of defendant's track between the freight platforms (either when occupied by freight cars or when unoccupied) for purposes of foot passengers to walk or to *defecate,* as brings the case within the doctrine of those cases charging de-

fendant with notice of such user. [Frye v. Railroad, 200 Mo. 377.] That element is out of the case.

We are of the opinion that the court erred in setting aside the verdict and granting a new trial. Accordingly, the cause is reversed and remanded with directions to the lower court to reinstate the verdict and judgment. *Graves, J.,* and *Woodson, J.,* concur; *Valliant, P. J.,* in the result.