**BARRY et al. v. LEGLER.**

No. 8611.

Circuit Court of Appeals, Eighth Circuit.

March 3, 1930.

Rehearing Denied May 8, 1930.

James M. Houston, of Kansas City, Mo., for appellants.

James M. Johnson and Donald W. Johnson, both of Kansas City, Mo., for appellee.

Before VAN VALKENBURGH and BOOTH, Circuit Judges, and DEWEY, District Judge.

VAN VALKENBURGH, Circuit Judge.

In the spring of 1920 there existed four oil corporations, to wit, the Ranger Refining Company, the Gate City Oil Company, the Steiner Oil Company, and the Steiner Oil Corporation, engaged variously in the production, refining, and marketing of oil in Texas and Missouri. In March or April, 1920, it was proposed to merge these four companies into one holding and operating corporation, and to this end appellants Barry and Scott, together with one Schwald, who was associated with them in the Ranger Refining Company, began the organization of the Ranger Refining & Pipe Line Company, a Delaware corporation, whose certificate of incorporation was filed in the office of the secretary of state of Delaware April 6, 1920. It was therein recited that the total authorized capital stock of this corporation should be $15,000,000, divided into 15,000,000 shares of common stock of the par value of $1 each. The amount of capital stock with which the corporation would commence business was placed at $1,000, consisting of 1,000 shares at par. Of this new corporation one R. L. Steiner was president, one Leon H. Schwald was vice president, appellant Barry was secretary, and appellant Scott was treasurer. From the outset Steiner discharged no active functions as president. The corporation, through agents employed for that purpose, began at once the sale of stock, described as preorganization stock, prior to July 1, 1920, and, after that, the capital stock of the company. From June 30 to November 1, 1920, inclusive, appellee, his mother, sister, and brother, residents of the state of Wisconsin, purchased 131,500 shares, for which they paid $109,625. Of this 94,000 shares were purchased at par, and 37,500 shares at 42 cents per share.

At the time of the merger the properties of the four corporations theretofore existing were taken over. It was then known that there were outstanding Steiner obligations of $400,000. Appellant Barry testifies that, immediately after the companies were taken over, "accounts payable began showing up for the Steiner Oil Company where payment for oil had been held in suspense while they were correcting titles to real estate, on which they were receiving oil. They had held up payments and there was a tremendous amount of those payments." They amounted to $475,000, making an indebtedness at the outset chargeable to the new company of $875,000. In the latter part of July, 1920, the company started to float a $1,000,000 bond issue; and, from the testimony of appellant Barry, it appears that about January 1, 1921, a temporary bond issue was put on through Stern Bros., brokers of Kansas City and Chicago. The financial situation was such, however, that immediately thereafter efforts were made to place on the market a $2,000,000 bond issue, but in April, 1921, while this matter was pending, and before such arrangements could be perfected, bankruptcy proceedings, with incidental receiverships, intervened. Ultimately the assets of the Ranger Refining & Pipe Line Company were sold under order of the court for $300,000. The assets were bought by the Interstate Refining Company, a corporation organized for that purpose. A dividend of 5 or 6 per cent. only was paid to creditors. For all the properties of the four merged companies the Ranger Refining & Pipe Line Company paid with 8,300,000 shares of its capital stock, distributed among the stockholders of such merged companies. The sale of stock following the organization of the Ranger Refining & Pipe Line Company, according to appellant Barry, aggregated approximately $175,000, including that purchased by appellee and his family. This stock was sold by David Weiss & Co., stock and bond brokers of Chicago, Ill. July 1, 1925, appellee brought suit against appellants Barry and Scott, and David H. Weiss of the firm of Weiss & Co., charging a conspiracy to defraud in the sale of the

stock aforesaid by means of false and fraudulent representations. The petition was in three counts. The first count dealt with sales to appellee personally; actual damages being laid at $46,562.50. The second count involved the sales made to appellee's brother aggregating $43,062.50, for which sum judgment was prayed. The third count sought recovery on account of the sales made to appellee's mother and sister in the aggregate of $20,000. The mother, brother, and sister had duly assigned their claims to appellee, and the total amount in suit was $109,625, with interest. The allegation of false and fraudulent representations is as follows:

"To induce plaintiff to purchase said stock, defendants themselves and by their agents, falsely and fraudulently represented to plaintiff that said Ranger Refining and Pipe Line Company was solvent; that it was upon a dividend paying basis; that it had no debts; that its assets exceeded its capital liabilities; that the book value of its stock was in excess of $1.25 per share; that the Ranger Refining Company had been paying dividends of three per cent. per month out of earnings of said company; that the assets of said Ranger Refining and Pipe Line Company were of such value and its business so prosperous that its capital stock was of an actual value exceeding its par value; that arrangements had been made to list said stock on certain stock exchanges; that the companies which had been taken over by the said company had all been prosperous and had been paying dividends out of earnings; that in a very short time the price of said stock to the public would be advanced to 125% of the par value, and said defendants further falsely and fraudulently represented that the said stock offered to plaintiff and which plaintiff purchased was treasury stock of said corporation; that no individual stock was being sold, and that the proceeds of the sales of stock, especially the stock offered to plaintiff would be turned into the treasury of said corporation as a part of its capital."

At the trial appellee dismissed as to Weiss, and the jury returned a verdict against Barry and Scott jointly in the sum of $27,-021.27 on the first count, $22,968.10 on the second count, and $13,510.63 on the third count. Judgment was entered accordingly, and this appeal followed.

The errors assigned and urged may be considered under these heads:

(1) The action of the trial court in admitting in evidence testimony of E. A. Biddick, Homer Rundell, and Dale Rundell concerning statements and representations as to the financial condition of the Ranger Refining & Pipe Line Company of a like nature to those upon which this action is based.

(2) The refusal of peremptory instructions requested by defendants at the close of all the evidence on the ground that neither scienter nor participation by defendants in the representations made had been shown.

(3) The instruction permitting the jury to find against defendants on all three transactions, for the reason urged that the evidence of appellee and his witnesses showed that neither defendant was liable under either the first or third purchase of stock made by appellee and his relatives.

(4) The action of the court in overruling the motion for new trial based upon an alleged showing that the verdict of the jury was a quotient verdict, and therefore unlawful.

(5) Sending into the jury room with the jury the petition in the case.

(6) Overruling· the motion for a new trial, and to set aside the verdict and judgment, on the ground that they were against the law and weight of the evidence.

(7) The action of the court in giving to the jury the following instruction:

"Gentlemen of the jury, you will take to the jury room with you, in addition to the petition in the case, two forms of verdict; one to be used in the event your verdict is for the plaintiff, one to be used in the event your verdict is for the defendant. The first is 'We, the jury in the above entitled cause, on the first count of the petition, find for the plaintiff and against defendants and assess plaintiff's damages at blank dollars.' * * * The other form is 'We, the jury in the above entitled cause, on the first count of the petition find for the defendants and against the plaintiff.' "

1. The testimony of these three witnesses, Biddick and the two Rundells, dealt with representations made by appellant Barry in person at a meeting May 21, 1920, at Livingston, Wis., held for the purpose of selling stock in the Ranger Refining & Pipe Line Company. The representations made, according to the testimony of these witnesses, were substantially identical with those charged in appellee's petition. The objection made is that this testimony is incompetent because the statement were not made in the presence of appellee. But they were made at a proximate date, and concerning the same subject-matter. They purport to have been made by

300

Barry himself. One of the defenses in this case was that the representations to Legler and his relatives, if made at all, were those of Weiss & Co., unauthorized by appellants and made without their knowledge. As to Barry, this testimony was clearly competent as bearing upon his intent and purpose, and, if the conspiracy and joint participation was shown, it was competent also as to Scott. Castle et al. v. Bullard, 23 How. 172, 186, 16 L. Ed. 424; Mutual L. Ins. Co. v. Armstrong, 117 U. S. 591, 6 S. Ct. 877, 29 S. Ct. 997; Thomas v. United States (C. C. A. 8) 156 F. 897, 17 L. R. A. (N. S.) 720; Chitwood v. United States (C. C. A. 8) 153 F. 551, 11 Ann. Cas. 814.

Furthermore, although at the hearing some contention was made to the contrary, the record unmistakably shows that objection to the depositions containing this testimony was withdrawn by counsel for both appellants.

2. Appellants, together with Vice President Schwald, had exclusive control of the corporation. Their respective duties are thus described by Schwald:

"Mr. Scott had charge of the books and the treasury end of the business. Mr. Barry, the general management of all except what I had, and that was the sale of the production and the supervision of these plants."

The representations complained of in this case were for the most part made directly by Weiss & Co. in their capacity of agents for the sale of this stock. David H. Weiss testified that they were employed by the officers of the Ranger Refining & Pipe Line Company, specifically naming F. E. Scott, I. N. Barry, and Leon H. Schwald; that they got the information which they imparted to prospective purchasers of stock "direct from people in authority connected with the company," naming "Mr. Scott, the treasurer, and Mr. Barry, the secretary, and Mr. Schwald." I. E. Weiss corroborates his brother upon this point. Barry testifies that Weiss & Co. had a contract with the company to sell its stock and were its fiscal agents. Scott said the stock was sold by Weiss & Co., who had offices in Chicago and in Kansas City, the headquarters of the Ranger Refining & Pipe Line Company. Both Legler and David H. Weiss testify that Barry was present in Wisconsin when the sale of 60,000 shares of stock was made to the Leglers in September, 1920, and heard the representations that Weiss made in effecting that sale. William G. Legler also states that, when he announced that he would not buy at that particular time, Barry himself "started in then and he told of some of the different things that had been repeated before," among which were that the book value of the company was $1.30 per share; that the company was making $100,000 a month in profits; that they had an application to sell the stock for $1.25 per share, and were expecting to get that for it about the first of October. Barry admits that he made "one or two trips" with Weiss for the sale of the stock. Scott says he sold no stock himself, but knew that Weiss & Co. were selling it and "I presume they represented it as the facts would justify."

It is undoubtedly true that, in an action to recover damages for deceit, it is necessary to show fraudulent intent, and knowledge of the falsity of representations made, and that, in general, an officer or director of a corporation is not liable for torts unless he participates therein, but "scienter may be shown by proof that false representation was made with knowledge of falsity, or in manner implying actual knowledge of fact stated, or that one making representation was in such situation as to have duty of knowing truth or falsity thereof." Boysen v. Petersen, 203 Iowa, 1073, 211 N. W. 894.

The doctrine is thus comprehensively stated in 14a C. J. p. 175, § 1955:

"Torts. A director, officer, or agent of a corporation is liable in damages for injuries suffered by third persons because of his torts, regardless of whether he acted on his own account or on behalf of the corporation and regardless of whether or not the corporation is also liable. He cannot escape liability on the ground that in committing the tort he acted as a director, officer, or agent of the corporation, or on the ground that the corporation may also be liable. As in any case, it is of course necessary that the facts show the commission of a tort before the officer may be held liable therefor. An officer or director of a corporation is not liable for its torts where he has not participated therein, or had any knowledge of, or given any consent to, the act or transaction. Conversely, he is liable where he has participated, or where he has had knowledge from first to last of the wrongful acts of the corporation. Likewise a director or officer is not merely by virtue of his position, liable in all cases for the torts of other directors, officers, or agents; he is liable when, and only when, he participated in the tortious act, authorized or directed it, or acquiesced in it when he either knew, or by the exercise of reasonable care should have known of it, and should have objected and taken steps to prevent it."

Furthermore, where there would be liability if the fraud were practiced by the officers or directors themselves, there is such liability if the officers and directors have been grossly negligent in permitting the fraud to be practiced by officers or agents under their control. 14a C. J. p. 107, par. 1872. The trial court instructed substantially in conformity with the rules thus quoted and declared. The personal responsibility of appellants must be judged by these principles as applied to the evidence before us, and will be considered further in connection with another assignment.

3. The first purchases of stock referred to in this assignment are the $20,000 purchase made by William Legler July 1, 1920, and the purchases of $7,500 and $6,500 made by his brother, Ernest J. Legler, on June 30, 1920, and July 1, 1920, respectively. Appellee testifies that in his purchase on the above date he consulted his uncle, J. C. Steinman, who had been a former owner of stock in the old Ranger Refining Company. The uncle spoke favorably of the stock in the new company. The contention of appellants is that appellee cannot recover damages for these purchases because he did not rely upon the representations charged, but rather upon the advice of Steinman, and is based upon the following cross-examination of appellee:

"Q. If it hadn't been for the information and advice of your uncle, do you think you would have bought? A. Well, I don't hardly think I would have went into it. I don't know whether my brother would have went into it or not."

From all the testimony it clearly appears that appellee did not rely entirely upon the advice of his uncle, but was influenced largely by the representations made as to the condition of the company. Upon this point the jury was justified in finding as it did.

The third purchase of stock to which reference is made in this assignment is that of appellee November 1, 1920, in the sum of $6,562.50, and of his brother on the same date in the sum of $9,062.50. The contention is that this was not treasury stock, but was the personal stock of Steiner, and that appellee and his brother knew it. These items affect only the first and second counts of the petition. It will be noted that the representation respecting treasury stock was but one of many charged; but, apart from this, the court charged, as requested, that, if the jury found that plaintiff knew, when he was purchasing the third block of stock in the Ranger Refining & Pipe Line Company, that he was purchasing the stock of some individual and not treasury stock, he could not recover on account of such purchase. The disparity between the amounts claimed and the verdict on these two counts indicates that the jurors followed this instruction in reaching their conclusion. This would seem to cover the challenge made in terms by this assignment; but the discussion under this head includes what is more properly termed the second purchase, which is the block of 60,000 shares bought by the Leglers in September, 1920. It appears from the testimony of Weiss, Legler, and Barry that, at the time this stock was purchased, the Leglers were compelled to make part payment in real estate notes; and it was arranged that, until these notes were converted into cash, and the proceeds had been covered into the treasury, the purchasers should receive stock standing in the name of one Charles Allen, who should be reimbursed in stock from the treasury when the company realized upon the notes. This man Allen appears in the record as a friend of Barry. His stock seems to have been conveniently at the latter's disposal. Concerning this transaction Barry says:

"When Mr. Weiss brought in the farm mortgage notes we borrowed from Mr. Allen enough of his personal stock to cover these mortgages and transferred from his personal stock * * * sufficient stock to pay for these mortgages and the same was sent to him.

"Q. So it left the transaction with Allen with the same amount of stock he had in the first instance? A. Yes, sir.

"Q. And the money in the treasury? A. Yes, sir."

In October, 1921, at the dictation of Barry, on the plea that this would assist him in straightening out some matters in the Kansas City office, and, perhaps, assist in saving their investment of more than $100,000, the Leglers signed a statement in the form of a letter that at the time they made this purchase they understood they were to receive the personal stock of Charles Allen. At that time both Scott and Barry were in Wisconsin to induce appellee and others to exchange their stock in the Ranger for that in the States Refining Company; a new company being organized by appellants as "a new plan to take us out of this trouble." The statement contains nothing inconsistent with the arrangement made at the time the stock was bought. Looking through the form to the substance of the transaction, we find that appellee and his relatives understood that

they were, and were, in effect, purchasing the stock of the company, the proceeds of which were to find their way into the treasury.

**4.** This specification raises the point that the court erred in overruling appellants' motion to set aside the judgment and grant a new trial, because, it is claimed, the jurors agreed beforehand to be bound by what is known as a "quotient verdict," arrived at by averaging the amounts suggested by each. There was filed in support of the motion the affidavit of one of counsel that he found in the jury room, after the verdict was announced, certain records of ballots taken by the jury which indicated that the individual jurors had marked down the amounts which each thought appellee should recover. There was, of course, found no extrinsic evidence of any agreement to be bound by the average result reached. In an effort to supply the latter, affidavits of nine of the jurors were tendered in support of the motion for new trial. The court declined to admit them. The question comes as to the competency of this proof offered over objection. This is a matter which each jurisdiction, state and federal, must settle and determine in accordance with its own self-preserving rules. The case is ruled by the holdings of the Supreme Court in McDonald et al. v. Pless, 238 U. S. 264, 35 S. Ct. 783, 59 L. Ed. 1300, to wit:

"The rule, endorsed by this court in this case, that a juror may not impeach his own verdict is based upon controlling considerations of public policy which in such cases chooses the lesser of two evils.

"While jurors should not reach a verdict by lot, or, as in this case, by averaging the amounts suggested by each, the verdict may not be set aside on the testimony of a juror as to his misconduct or that of his colleagues."

To the same effect Hyde v. United States, 225 U. S. 347, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; Williams et al. v. United States (C. C. A. 6) 3 F.(2d) 933; Ramsey et al. v. United States (C. C. A. 6) 27 F.(2d) 502.

And this is also the rule in Missouri, in which this case was tried. Green v. Terminal R. R. Ass'n, 211 Mo. 18, 109 S. W. 715. Mattox v. United States, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917, is cited to the contrary. It was there held that a juror may testify as to the existence of any extraneous influence, although not as to how far it operated upon his mind. The distinction is apparent. We have here the existence of no extraneous influence. The McDonald Case, supra, concerned an alleged quotient verdict.

**5.** Error is predicated upon the action of the court in permitting the petition to be taken to the jury room in order that the jury might have in mind the issues upon which it was to pass. The court carefully instructed that the allegations of the petition were not evidence in the case, but only statements of what the plaintiff hoped to prove. It announced at the conclusion of the charge that the petition could be taken to the jury room, and to this no exception was preserved. No reversible error results.

**6.** To this specification we have but to say that the granting or overruling of a motion for new trial rests in the sound discretion of the trial court, and that, in addition thereto, we think the evidence sufficient to warrant submission to the jury.

7. Upon giving to the jury its instruction as to the forms of verdict, quoted above under the number of this assignment, the court itself dictated the following exception, which presents the issue clearly:

"The defendants except, and each of them, to the forms of verdict, submitted to the jury, it being the contention of the defendants that a separate form should be submitted for each defendant, so that the jury might have returned a verdict for one defendant even in the event it might not have returned a verdict against the other defendant. Is that all right?"

"Mr. Neel (for defendants): Yes."

In considering this assignment of error, reference is again made to the discussion under specification No. 2, supra.

The allegation of conspiracy in an action for tort which may be committed without a conspiracy, or plurality of tort-feasors, is mere matter of inducement and evidence, and, though a conspiracy be not shown, recovery may be had against the defendant, or defendants, participating in the tort. The gist of the action is not the conspiracy, but the damage done to the plaintiff by the acts of the defendants. The averment of the conspiracy does not change the form of action, which is an action on the case.

"The significance of the conspiracy consists, therefore, in this: That it gives the person injured a remedy against parties not otherwise connected with the wrong. It is also significant as constituting matter of aggravation, and as such tending to increase the plaintiff's recovery." Cooley on Torts (3d Ed.) 211, 212; Burdick's Law of Torts (4th

Ed.) par. 58, p. 474; Howland v. Corn (C. C. A. 2) 232 F. 35; Medlin Milling Co. v. Commission Co. (D. C.) ·218 F. 686, 690; James v. Evans (C. C. A. 3) 149 F. 136; Freeman v. Evans (C. C. A. 3) 159 F. 26; Young v. Gormley, 119 Iowa, 546, 93 N. W. 565; Parker v. Huntington et al. 2 Gray (Mass.) 124; Gurney v. Tenney, 197 Mass. 457, 84 N. E. 428; Hunt v. Simonds, 19 Mo. 583, 587.

Ordinarily, in a civil action for conspiracy to defraud, the liability of the individual defendants, as well as the existence of the conspiracy, is for the jury; and a verdict may be returned against those whom the evidence shows are guilty and in favor of those who are innocent. Hoxsie v. Nodine (C. C. A. 9) 123 F. 379; Black v. Gorey, 19 Ohio App. 49; Pearson v. Wallace, 203 Mich. 622, 170 N. W. 72; Auto Workers' Temple Ass'n v. Janson, 227 Mich. 430, 198 N. W. 992; Aygarn v. Blue, 118 Ill. App. 393; Reed v. Dick, 7 Kan. App. 760, 53 P. 486; Reinertson v. Chemical Products Co., 205 Iowa, 417, 216 N. W. 68; Berns v. Usrey, 86 Ind. App. 38, 155 N. E. 717; Parker v. Luse, 97 Okl. 101, 223 P. 122; MacDonald v. Perry, 32 Ariz. 39, 255 P. 494; McCarty v. Hemker (Mo. App.) 4 S.W.(2d) 1088, 1094; School District No. 5 v. Ferrier, 122 Kan. 15, 251 P. 425; 38 Cyc. 491, 1883, 1884; Morrill v. Lindemann, 86 Ill. App. 75.

A limitation of the rule that a verdict may be returned against one alleged conspirator and in favor of another, as the evidence may show, is thus stated in 12 Corp. Jur. par. 105, p. 585:

"An obvious limitation on the rule stated in the foregoing section is that it is of course essential to allege and to prove a conspiracy, where the act which is alleged as the basis of liability is one which if committed by an individual would impose no liability. Cases of this sort, it has been said, may be termed 'actions for conspiracy,' and are distinguishable from those cases previously considered where the conspiracy results in the commission of that which would be an actionable tort whether committed by one or many. A further limitation of the rule very generally recognized is that, if the injury could have been inflicted only by the joint action and mutual co-operation of defendants, the proof must implicate all or enough to have done the injury charged."

And, of course, in cases where the rule of respondeat superior applies, the master cannot be convicted if the servant whose act imputes liability to the master is acquitted. None of these situations is present here. The only remaining case in which the court may take from the jury the question of whether the individual defendants conspired is when the evidence of joint participation, within the rules hereinabove stated, is undisputed, or so preponderant as to come within the accepted rule governing directed verdicts. That such was the nature of the evidence was evidently the view of the trial court, for it did not submit the question of whether conspiracy, or joint participation, existed; but by the forms of verdict, given over defendants' objection, the jury was instructed to find against both defendants or in favor of both. It remains to consider whether, upon the record, this form of submission was justified.

The action of the trial court is not without express authority to support it, under very similar circumstances.

"Where several join actively in the promotion of a corporation, each and all of the persons who are so associated will be jointly and severally liable for the fraud and false representations of the others in the course of the joint enterprise." 12 Corp. Jur. 268.

In Williams v. Riddlesperger, 217 Ala. 62, 114 So. 796, 798, the question presented was whether, under the evidence, defendant Preston could be held liable for the misrepresentations and concealments charged by the plaintiff directly against Preston's associate directors, Williams and Ellis. These three were controlling officers and directors, and were the principal stockholders of the corporation. The three in directors' meeting had agreed to sell stock at a time when they knew the company was in bad shape. The court said:

"The undertaking * * * was a joint enterprise for their personal benefit, the execution of which was intrusted to Williams. In such a case, both upon reason and authority, Williams' two associates must be held liable for his fraud in the accomplishment of their joint design, notwithstanding their personal ignorance of his tortious conduct in the premises. (Citing cases.)"

See, also, Myerhoff v. Tinslar, ·175 Ill. App. 29; Tyler v. Savage, 143 U. S. 79, 98, 12 S. Ct. 340, 36 L. Ed. 82.

The principal contention in this regard was with respect to Scott. It is claimed that the evidence fails to connect him with knowledge of, or participation in, the tort charged. It becomes necessary, then, to examine the

record with respect to appellant Scott's connection with the enterprise.

Barry, the secretary, and Scott, the treasurer, were, with Schwald, the principal promoters, incorporators, and managing officers of the Ranger Refining & Pipe Line Company. They had been jointly interested in the old Ranger Refining Company and the Gate City Oil Company. They owned 315,-000 shares of the capital stock of the new company, which was incorporated April 6, 1920. The merger followed in May, 1920. Even before that date the sale of preorganization stock in the merged company had been launched. Weiss brothers testify that they were employed to sell this stock by the officers, naming Barry, Scott, and Schwald. Barry and Scott say that the contract was with the company. Barry participated directly in the stock sales; Scott did not, but all such transactions with the proceeds came directly to him as treasurer; and, in his official capacity, he knew more intimately than any one the financial condition of the company. He knew that the Ranger owed $875,-000. on account of the Steiner companies, that a temporary bond issue of $1,000,000 was floated after months of effort, and that this was found to be so inadequate to meet the needs of this failing venture that a $2,-000,000 issue was in contemplation when bankruptcy intervened in the spring of 1921. Meantime the stock selling campaign continued without abatement. Scott knew that the company was indebted to the extent of $1,514,962.40 June 30, 1920, when the sales to the Leglers began, shown by a Bradstreet's report as of that date, the correctness of which he concedes. He was cognizant of the so-called Seymour Valuation Report, issued by one F. R. Seymour, which was circulated and used almost exclusively in the sale of stock. This report assigned to the properties of the Ranger Refining & Pipe Line Company, as of July 1, 1920, the greatly exaggerated value of $8,307,753.13, with no mention of liabilities. Scott, at the trial, vouched for the correctness of this report.

The Leglers made their last stock purchases November 1, 1920. October 20, 1920, Scott, as treasurer, issued a circular letter to stockholders advising them that the company had declared a stock dividend to be paid November 20, 1920. He said:

"In view of the general money stringency throughout the country, the Board has determined to conserve its cash resources by a declaration of a stock dividend instead of cash out of accumulated surplus. The company can use advantageously its entire cash resources for the purchase of crude and other corporate purposes."

At this time they were as yet unsuccessfully attempting to float a $1,000,000 bond issue to take care of their pressing indebtedness. November 30, 1920, he wrote another letter, inclosing, as a dividend, capital stock of the company, on the basis of 2 per cent. of the holdings of each stockholder. Reference is again made to a supposititious cash surplus, carefully guarded on account of the economic condition of the country. The financial status of the company is painted in cheerful colors. The dividend was accompanied by a pamphlet couched in still more glowing and alluring terms. In October, 1921, after the failure of the Ranger Company, we find Scott and Barry again in Wisconsin, for the purpose of inducing appellee to exchange his stock in the Ranger for a like amount in the States Refining Company, organized by them to float a bond issue—expected to be taken by the creditors—and to bid in the Ranger properties at as low a figure as possible. At this time Scott, it is said, did most of the talking. Later, in January, 1923, Scott wrote Legler of the organization of still another corporation, the Rotary Refining Company, whose stock would be exchanged for his Ranger stock upon payment by Legler of 10 per cent., stated at $5,686.50.

The record is susceptible of but one interpretation, and that is that appellant Scott was a moving spirit and a participant in this joint venture of marketing the stock of the Ranger Refining & Pipe Line Company to the personal advantage and profit of himself and his associates. Appellants cannot escape liability on the ground that, in committing the torts charged, they acted as officers of a corporation. They were both well aware of what was being done, and must be held liable for the fraud practiced by agents under their control. There can be no doubt that this stock was sold with knowledge that the company was in a failing condition, and with a reckless disregard of the truth and accuracy of the representations made to induce the sale. This issue was submitted to the jury under an appropriate charge, to which no exception was taken. The record before us is so conclusive of the joint participation charged that the forms of verdict submitted were fully justified. All matters urged by appellants have been carefully considered.

Finding no reversible error in the record, the judgment accordingly is affirmed.